**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**James Walter STARRETT, Timothy Kevin Duke, Michael Lee Cave, Donald Joe Sears, James Thomas Nolan, Frederick Joseph Hegney, Defendants–Appellants.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Donald Joe SEARS, James Thomas Nolan, Defendants–Appellants.**

Nos. 89–5669, 92–5006.

United States Court of Appeals, Eleventh Circuit.

June 27, 1995.

---

13. The motion of the National Abortion Federation to intervene is denied.

1526

Paul McKenna (court-appointed), Coconut Grove, FL, for Starrett.

Kathy Hamilton (court-appointed), Coconut Grove, FL, for Duke.

Leon E. Tozo (court-appointed), Coral Gables, FL, for Cave.

Michael G. Smith, Ft. Lauderdale, FL, for Sears in both cases.

Dexter W. Lehtinen, Kendall B. Coffey, U.S. Attys., Theresa M.B. Van Vliet, Kathleen M. Salyer, Anne Ruth Schultz, Linda Collins Hertz, Asst. U.S. Attys., Miami, FL, for the U.S.

Charles G. White (court-appointed), Miami, FL, for Nolan in both cases.

Fred A. Schwartz (court-appointed), Adorno, Zeder, Allen, Yoss, Bloomberg, Schwartz & Goodkind (court-appointed), Miami, FL, for Hegney.

Before CARNES, Circuit Judge, DYER and GUY *, Senior Circuit Judges.

PER CURIAM:

This appeal arises out of the conviction of appellants James Thomas Nolan, James Walter Starrett, Donald Joe Sears, Frederick

---

* Honorable Ralph B. Guy, Jr., Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

Joseph Hegney, Michael Lee Cave, and Timothy Kevin Duke—six members of a gang known as the Outlaw Motorcycle Club. All six appellants were convicted in the United States District Court for the Southern District of Florida for violating the conspiracy provision of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). In addition, Nolan, Sears, Hegney, and Cave were convicted of violating a substantive RICO provision, 18 U.S.C. § 1962(c), and Hegney was convicted of three counts of distributing cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

The appellants contend that the district court made numerous errors, including: (1) the denial of appellants' Fed.R.Crim.P. 29 motions seeking judgments of acquittal on insufficiency of evidence grounds; (2) the denial of Duke's Fed.R.Crim.P. 29 motion in which Duke contended that he had presented sufficient evidence to establish as a matter of law his defense of withdrawal from the conspiracy; (3) the rejection of Nolan's proposed jury instructions; (4) the denial of Cave's motion for judgment of acquittal based on a variance between the indictment and proof at trial; (5) the denial of the severance motions of Hegney, Sears, and Cave; (6) the denial of Nolan's motion for a new trial based on newly discovered evidence; and (7) the denial of Nolan's and Starrett's motions for a mistrial based on the government's alleged violations of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[1] For the reasons discussed below, we affirm the convictions.

## I. PROCEDURAL BACKGROUND

On June 3, 1986, a federal grand jury indicted Nolan, Starrett, Sears, and Hegney, for substantive RICO offenses in violation of 18 U.S.C. § 1962(c) (Count I), and for RICO conspiracy in violation of 18 U.S.C. § 1962(d) (Count II). On July 29, 1986, the jury returned the second superseding indictment which added Cave and Duke as defendants in both counts, and which added Counts III, IV, and V charging Hegney alone with substantive narcotics offenses in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Minor corrections were made in the third and fourth superseding indictments.[2] In addition, Count I of the fourth superseding indictment provided for the forfeiture of any and all interests of appellants in the real property commonly known as the Outlaws' South Florida Clubhouse.

Prior to trial, the district court ruled on numerous motions, including motions for severance by Hegney, Sears, and Cave, which it denied.

Jury selection began on December 10, 1987, and after a trial lasting more than a year, the jury returned its verdict on January 23, 1989. The jury found Nolan, Hegney, Sears, and Cave guilty on both the substantive RICO and RICO conspiracy counts; it also found Hegney guilty on the three narcotics counts. The jury found Starrett and Duke guilty only as to the conspiracy count. The district court sentenced the appellants as follows: Nolan was sentenced to two consecutive terms of twenty-five years' imprisonment;[3] Hegney was sentenced to various terms, some of which were consecutive and some concurrent, totalling forty years; Cave and Sears were each sentenced to two consecutive terms of twenty

---

**1.** Having carefully reviewed the record, we reject without further discussion appellants' additional contentions concerning: (1) various evidentiary rulings; (2) the denial of various suppression motions; (3) the refusal to order bills of particulars; (4) the admission of evidence allegedly in violation of double jeopardy; (5) the court's alleged demonstration before the jury of bias against Sears's counsel; (6) the order forfeiting to the government Hegney's interest in the clubhouse; (7) the court's alleged allowance of ex parte communications between the court and attorneys for the government; (8) the sentencing of Nolan as a special dangerous offender; (9) various claims of prosecutorial misconduct; and

(10) the denial of a motion for mistrial based on alleged Jencks Act violations.

**2.** The fourth superseding indictment returned on February 19, 1987, was the one upon which the appellants were ultimately tried. All references in this opinion to counts and predicate acts in the indictment pertain to the fourth superseding indictment.

**3.** Nolan was prosecuted as a dangerous special offender pursuant to 18 U.S.C. § 3575, which has been repealed, but not insofar as it applies to this case.

years' imprisonment; Duke was sentenced to twenty years' imprisonment; and Starrett to thirteen years' imprisonment.[4] Each of the six defendants appeals his conviction.

## II. FACTS

### A. THE OUTLAWS—STRUCTURE AND OPERATION [5]

The Outlaw Motorcycle Club (the "Outlaws") is one of the four largest national "one-percenter" motorcycle clubs.[6] Witnesses testified that the term "one-percenter"—usually depicted by the symbol "1%er"—is motorcycle gang parlance meaning that the club is comprised of the one percent of the overall biker population who maintain total independence from society, and who are known to cause the most trouble, or "raise the most hell." The Outlaws was established sometime in the mid–1960s, and operates on a national, regional, and local level. There are several chapters of the Outlaws in Canada as well. The local chapter that is involved in this case is the South Florida chapter of the Outlaw Motorcycle Club ("South Florida Outlaws" or "South Florida chapter").

Appellant Nolan established the South Florida chapter of the Outlaws around 1969. Nolan served as president of the South Florida Outlaws for many of the years relevant to this case, and he also served as president of the regional organization for part of that time. After an aggressive membership drive in the early 1970s, Florida eventually had the largest concentration of Outlaws in the United States.

To become an Outlaw, a prospective member has to be sponsored by a "patchwearing" member of the Outlaws. A "patchwearing" or full member of the Outlaws wears various patches, which are also referred to as the member's "colors." One patch proclaims the Outlaws' status as a "1%er" club, and anoth-

er patch bears the Outlaws' "Charlie" logo consisting of a skull and crossed pistons. Outlaws are instructed to guard their patches with their lives, and no item bearing the Charlie logo is allowed to touch the floor.

A sponsored prospective member is known as a "probate" and identified by a mandatory probationary "patch" consisting of a cut-off denim jacket that says "Probationary Outlaws" on the back. The Outlaw members must agree by unanimous vote before a probate can become a full-fledged patchwearing member.

Only white males are allowed to become members of the Outlaws. Each Outlaw member is required to own an American-made motorcycle and to maintain it in good operating condition. The club holds weekly meetings, known as "church" meetings, and all patchwearing members are required to attend. In addition, members are required to attend national, regional, and local "runs," which are motorcycle trips and parties that may last several days. National runs are held three or four times a year, regional runs occur between five and twenty times a year, and local runs usually occur weekly. Members pay monthly dues, and also have to pay fees for each run. If an Outlaw is in need of legal assistance, each member is usually assessed a fee for that purpose.

Most of the South Florida Outlaws' activities revolve around their clubhouse. The clubhouse is a house or trailer where the Outlaws hold their meetings and socialize. Armed club members guard the clubhouse twenty-four hours a day. One witness testified that the South Florida Outlaws' clubhouse is equipped at all times with an arsenal of guns and explosives, which are kept in the "toy box."

Each chapter of the Outlaws has elected officials—a president, vice-president, secre-

---

4. Starrett was released on parole in April of 1994.

5. This description of the Outlaws' organization and activities pertains to the time period relevant to this case—from the early 1970s through 1986.

6. The indictment defines the national organization as "the Outlaw Motorcycle Club a/k/a American Outlaw Association." These two names appear to be used synonymously throughout the record, but in this opinion we will refer to the national organization only by the name "Outlaw Motorcycle Club."

tary-treasurer, and an "enforcer."[7] During Nolan's presidency, no member of the Outlaws was allowed to retire from the club. Even after Nolan's reign, a member who attempted to leave the Outlaws was threatened with harm to himself and his family.

One of the most salient characteristics of the Outlaws is their attitude toward women. Not only are women not allowed to be members of the Outlaws, but a woman who associates with an Outlaw is known as his "old lady" and is deemed to be his property. If an old lady is "patched" it means that she can wear a patch identifying her status as the property of her Outlaw boyfriend. Some are designated as property of the club as a whole. Outlaw members often keep more than one old lady at a time, and the member ranks his old ladies by their respective levels of responsibility and privilege. The old lady with the most responsibility, and ostensibly the most privilege, is designated his "number one old lady." The members sometimes buy and sell their old ladies amongst themselves.

It is the responsibility of the number one old lady to educate a new old lady as to her duties. Those duties are to work and give her money to her Outlaw man, to do whatever any Outlaw tells her to do with no questions asked, to refrain from taking drugs unless given permission by an Outlaw, and to stay out of trouble in general. In addition to her other responsibilities, the number one old lady gathers family information about a new old lady which can later be used to threaten the woman should she attempt to run away.

Most old ladies are required to work either as nude dancers or prostitutes to support their Outlaws. Sometimes old ladies can obtain their freedom from the Outlaws by buying their way out. One method the Outlaws employ to maintain control over an old lady is to provide her with a steady supply of drugs. This, coupled with the small amount of money that the old ladies are allowed to keep, and the rule that they may not take drugs without permission, leads to their total dependency on the Outlaws.

If an old lady withholds her earnings from her Outlaw, or tries to run away, or breaks the rules in any other manner, the Outlaws employ several forms of punishment. The Outlaw who owns the old lady may beat her or threaten to sell her to another Outlaw; or, if the misbehavior is deemed more serious, she may be subjected to "training." This training may include sending her to a prostitution "lock up" at one of several truck stops. She is on call for prostitution twenty-four hours a day for as long as she remains there, which could be for weeks at a time. The money she receives is divided between the truck stop owner and the Outlaw who owns her. Other forms of "training" that are inflicted on errant old ladies include beatings with an axe handle, and gang rape by all of the Outlaw chapter members.

Although at first the South Florida Outlaws did not deal in drugs, a decline in prostitution income in the mid–1970s caused Nolan to expand the Outlaws' activities into narcotics trafficking as an additional source of income. In narcotics, Outlaws mostly deal with other Outlaws in order to reduce the risk of detection. If an Outlaw deals with an outsider, he makes his association with the Outlaws known to the outsider in order to intimidate him into remaining silent. The Outlaws deal drugs directly from the clubhouse as well as while they are on regional, national, or local runs. In addition, when a member of the Outlaws is imprisoned, the other members supply him with narcotics for personal use or for sale to other inmates. Old ladies assist the narcotics trade by counting and repackaging the narcotics prior to resale, and sometimes by smuggling drugs into prison. The Outlaws have used the proceeds from the sale of narcotics to purchase at least one of their clubhouses.

## B. THE PREDICATE ACTS

The jury was given verdict interrogatories which listed the predicate acts charged against each defendant, and it made specific findings as to whether each predicate act had been proven. All of the predicate acts described hereafter are ones the jury specifical-

---

7. The position of enforcer was described variously at trial as a bouncer, as a sergeant at arms, and as the one who keeps the peace among members of the club.

ly found had been proven beyond a reasonable doubt.

### 1. James Thomas Nolan

The jury convicted Nolan of the substantive RICO violation charged in Count I and of the RICO conspiracy charged in Count II. In the course of doing so, the jury found that of the thirty-eight predicate acts charged against Nolan, the government had proven thirty-four of them. Some of those thirty-four predicate acts are described in the following discussion.

#### a. The Hell's Angels Murders

In the spring of 1974, Nolan discovered that three members of the Hell's Angels Motorcycle Club were on their way to South Florida. At the time, the Hell's Angels and the Outlaws were embroiled in a feud that had begun the year before when an Outlaw had been severely beaten by a group of Hell's Angels in New York. After receiving a tip that the three Hell's Angels were going to be at a local bar, Nolan and other members of the South Florida Outlaws went to the bar. After some discussion of their differences, Nolan suggested they get the discussion "off the street," and persuaded the Hell's Angels to go to the Outlaw clubhouse, promising that no harm would come to them. Once the Hell's Angels were at the clubhouse, however, Nolan instructed several Outlaws to drive them to a deserted area and "make sure they don't come back . . . ." Following Nolan's orders, four Outlaws drove the captive Hell's Angels to a water-filled rock pit. They tied up the three men and weighted them down with cinderblocks, shot each one in the head with a shotgun, and dumped the bodies into the water. The bodies were discovered three days later. Nolan and three other Outlaws were charged in state court with the murders, but Nolan was acquitted after presenting what other witnesses at this trial testified was a fabricated defense.

#### b. The Extortion of Joyce Karleen

Joyce Karleen first encountered the Outlaws in August of 1974 when she was in Daytona Beach, Florida. Karleen was looking for work at the time, and she met two men who invited her to accompany them to Hollywood, Florida, where they said she might find work. They took her to stay at a trailer in Hollywood, Florida, which she later discovered was the Outlaw clubhouse. There she met appellants Sears and Nolan.

On the first day of Karleen's stay, Nolan asked her to get him a beer. When Karleen replied that if he wanted a beer, he should get it himself, Nolan hit her. On the second day of Karleen's stay, Nolan approached her, displayed a gun, and told her to go with him to the back room so he could fill her in on the obligations of being an Outlaw old lady. Once in the back room, Nolan told Karleen that she would be expected to work and give her earnings to the club, and that she would have to do as she was told. Nolan then held a gun to her head and ordered her to perform oral sex on him. She did. Nolan raped Karleen, and after he left the room, eight other Outlaws came into the room and proceeded to rape her. Nolan had told her that she should do exactly what the others told her to or he would beat her. When Karleen struggled against her attackers, Nolan came back into the room and punched her in the mouth. The next day, Karleen was taken to a local lounge to work as a topless dancer with all of the other old ladies.

Later that week, on August 22, 1974, several Outlaws came to believe that Karleen had stolen some clothing bearing a property patch from one of their "patched" old ladies. So, they abducted Karleen as she left the lounge after work. They took her back to the clubhouse, tied her to a chair, and ripped her blouse off. They each took turns punching and kicking her. Using a hot spoon they seared her repeatedly on her arms and breasts. Then they dumped her, battered and partly naked, in a remote field. She managed to survive, reported the incident to the police, and several Outlaws were later convicted of the brutal beating.

#### c. The Kidnapping and Murder of Naomi Sinoqub

Naomi Sinoqub was Sears's old lady during the time that Joyce Karleen was staying at the Outlaw clubhouse. She was with Kar-

leen the night that Karleen was beaten and tortured. After the Outlaws had finished torturing Karleen, they covered her head with a sheet. Sinoqub and other Outlaw old ladies were then escorted into the room where Karleen remained tied to a chair. The Outlaws pulled the sheet from over Karleen's head and told the old ladies to take a good look, that this is what could happen to them if they misbehaved.

Sinoqub ran away shortly after this incident. Nolan contacted some of his fellow Outlaws, including appellant Sears, and told them to locate Sinoqub because he was afraid she would be picked up by the police as a witness to the Karleen beating. Once Sears found Sinoqub, Nolan instructed him to kill her. To carry out Nolan's order, Sears and another Outlaw, Dick Brainard, took Sinoqub out on Brainard's fishing boat. They shot her twice in the head, slashed her throat and abdomen, weighted her with something heavy, and dumped her into the ocean. Her body was never found, and state charges were never filed against anyone for this murder.

### d. The Kidnapping and Extortion of Tina Wittenstein and Vaughn Foreman

Tina Wittenstein was Nolan's old lady during part of the late seventies. As Nolan's old lady, Wittenstein worked as a prostitute, and sometimes as a topless dancer. In July of 1977, Wittenstein attempted to run away from the Outlaws with the help of Vaughn Foreman, one of her regular customers. They stayed away from South Florida for a month, but eventually returned to the area. Nolan found Wittenstein and held her at his house under armed guard.

Nolan told Outlaw Thomas Belcher that he was holding Wittenstein for $20,000 ransom, which he intended to collect from Foreman. Nolan then sent some of his Outlaws to find Foreman. They located Foreman, took him to an Outlaw's house, beat him in the face with the butt of a shotgun, stuck a lit cigarette in his eye, put the barrel of the shotgun in his mouth and told him to beg for his life. At that point Nolan arrived and told Foreman that he wanted his property, i.e., Wittenstein, back. Foreman protested that he loved Wittenstein and wanted to be with her. Nolan offered to sell her to Foreman for $100,000, and said he would not release her until he received the money. Nolan forced Foreman to stay with the Outlaws for a few days while Foreman tried to raise the money.

After Foreman had given Nolan $40,000, Nolan released them both. Foreman gave Nolan another $20,000, but after he and Wittenstein were married that fall, Foreman told Nolan he would not give him any more money. Foreman and Wittenstein then moved to California to get away from Nolan.

### e. The Extortion of Iris Geoghagen

While Nolan was in Florida state prison in 1980 on narcotics charges, another Outlaw named Ronald Watchmaker introduced Iris Geoghagen to him, intending to give her to Nolan as a "gift" when Nolan got out of prison. Instead, Watchmaker "gave" Nolan forty-nine percent of Geoghagen while Nolan was still in prison. Nolan then offered to buy the remaining fifty-one percent of Geoghagen from Watchmaker for $2,000. Watchmaker gave Geoghagen the choice of whose old lady she would rather be. Thinking that she would be entitled to better privileges as Nolan's number one old lady than she would be as Watchmaker's number two old lady, Geoghagen chose Nolan. Geoghagen visited Nolan every weekend in prison, and on many visits she smuggled cocaine and marijuana to him both for his personal use and for sale to other inmates.

After Nolan was released from prison in September of 1980, Geoghagen moved with him to Tucson, Arizona. Nolan had led Geoghagen to believe that she would be treated to a thirty-day "honeymoon" during which she would not be required to work as a prostitute. Nolan also had told her that he would refrain from bringing any other old ladies home during the honeymoon. However, there was no honeymoon. Nolan did require Geoghagen to work as a prostitute during that thirty-day period, and he did bring other old ladies home.

After they moved to Arizona, Nolan began to beat Geoghagen on a regular basis. On one occasion, when Geoghagen appeared up-

set, Nolan asked her what was wrong. She replied that her feelings were hurt because Nolan had not kept a date with her. Nolan flew into a rage, punched her in the eye, threw his boot at her, and forced the money she had earned in prostitution that night down her throat. Another time, Geoghagen could not find a bag of marijuana which she had hidden somewhere and which Nolan wanted to sell. Nolan punched her so hard with his fists on her chest and back that he broke one of her ribs. Geoghagen asked Nolan to let her go to the hospital, and he acquiesced only after she had concocted a false story to explain the injuries.

One night while Nolan was inhaling nitrous oxide, Geoghagen, who saw that he had passed out, pulled the tube from his mouth and began to inhale herself. Nolan awoke and saw that she had taken the tube from him. He screamed at her and said that if she was going to act like a man, she was going to be beaten like a man. He knocked her to the ground, kicked her, picked her up and knocked her down again, dragged her by the hair into the bedroom, and forced the barrel of a handgun into her mouth.

In January 1981, Geoghagen went to visit her sick mother in Florida. Nolan could not go with her because of the terms of his parole, so he told her that if she did not come back, he would kill her stepfather, who was her mother's sole caretaker. Geoghagen asked Nolan if she could buy her freedom, and he said that it would cost her $125,000 to be free, but that she could not pay him with her prostitution earnings because that money was his anyway.

In March of 1981, after spending a night out partying, Geoghagen stumbled into a parked motorcycle at a bikers' bar. Nolan responded by hitting Geoghagen several times and called one of his other old ladies to come get Geoghagen and take her home. On the way home, Geoghagen jumped out of the car at a stop light and ran, hiding behind a convenience store. Geoghagen did not realize that a police car was right behind them and that the police had seen her run. The police approached Geoghagen and tried to find out what the problem was; she begged them to leave her alone. While she was being questioned by the police, Nolan's other old lady went and got him, and he rode his motorcycle back to the scene. He convinced the police to let him take Geoghagen home, that she had just had too much to drink.

At a stop light on the way home, Geoghagen jumped off the back of Nolan's motorcycle and began to run again. Nolan ran after her. When he caught up to her he punched her repeatedly in the face until she said she would get back on the motorcycle. He held her by the hair until they got home. Once in the driveway at their house, Geoghagen, who was terrified that Nolan would kill her, started to scream, hoping that one of the neighbors would help her. As Nolan hollered at Geoghagen to shut up, he grabbed her by the chin and squeezed, lifting her off the ground. Nolan's crushing grip broke Geoghagen's lower jaw, and she passed out.

When Geoghagen awoke, she was face down on the bed. Nolan pulled her head up by the hair and held a gun to the back of her head. He said he ought to have "them" take her out and kill her. Nolan then hit Geoghagen on the back of the head with the gun and she blacked out again. The next time she awoke, Geoghagen looked in the mirror and saw that she was missing large patches of hair and that she was bleeding from the mouth, eyes, and nose. She again begged Nolan to let her go to the hospital, telling him that her jaw was broken. At first Nolan said there was nothing wrong with her, but after he looked at Geoghagen's jaw, he said she could go to the hospital but only if she devised another story about how she had been injured.

Geoghagen's jaw had been broken in half. She stayed in the hospital for six days while she had a pin surgically implanted in her jaw and her mouth wired shut. During her stay, Nolan brought another old lady to the hospital to visit Geoghagen. As he stood over the battered Geoghagen, Nolan said to the other old lady, "You see what I did to her? ... I'm in love with her. I don't even like you mother fucker. Go ahead and piss me off."

Shortly after Geoghagen arrived home from the hospital, she got out of bed one night and saw Nolan in the living room with

a new old lady, who was only thirteen years old. Nolan was orally sodomizing the young girl. Dismayed by what she had witnessed, Geoghagen took as many pills as she could find in an attempt to commit suicide. On discovering Geoghagen unconscious, Nolan dragged her from room to room and beat her for more than three hours with a belt. When Geoghagen awoke, her legs felt like they were burning and she saw that they were a swollen mass of black and blue welts. The next day Geoghagen escaped with the help of a friend and soon made her way back to her parents' house in Florida. Her parents called the police, and Geoghagen eventually agreed to give the police a statement.

*f. The Prostitution and Narcotics Offenses*

Eight of the predicate acts the jury found Nolan had committed occurred after June 3, 1981, while he was still on parole in Arizona. Although Nolan had satisfied the parole board that he was working for former Outlaw David Allan Coe, in actuality Nolan was making a living in Arizona through his old ladies' prostitution and through narcotics distribution.

After Geoghagen escaped from Nolan in April of 1981, Nolan made arrangements with his long-time Outlaw friend, Sam Nail, to purchase another woman to make up for Nolan's lost prostitution income. Four of Nolan's predicate acts related to this transaction, which occurred between June 12, 1981, and June 24, 1981. Around the same time, Nolan and Nail conspired to bring cocaine from South Florida to Arizona, which they succeeded in doing at least twice. Three of Nolan's predicate acts related to this cocaine conspiracy between Nolan and Nail. The dates for those predicate acts all fell after June 3, 1981. Nolan also conspired with appellant Starrett to transport a large quantity of marijuana from South Florida to Arizona after June 3, 1981.

### 2. Frederick Joseph Hegney

The jury convicted Hegney of the substantive RICO violation charged in Count I and of the RICO conspiracy charged in Count II. In the course of doing so, the jury found that the government had proven beyond a reason-able doubt all eight predicate acts charged against Hegney. Three of those predicate acts were charged as separate narcotics offenses in Counts III, IV, and V of the indictment, and the jury found Hegney guilty of those offenses as well. Hegney's predicate acts are described below.

*a. The Murders and Attempted Kidnapping of Fernando Stefano, Thomas Young, Wendy James, and David Bostic*

A non–Outlaw named Fernando Stefano defiled Brigit Smith, who was the old lady of an Outlaw named Clarence Michael Smith, a/k/a "Smitty." Smitty and Stefano were enemies. After Brigit Smith got off work one night in February of 1983, Stefano forced her into the back of a van and masturbated on her, telling her "that was for Smitty." Smith thought Stefano was an Outlaw and that she could not refuse his demands. When she reported the incident to Smitty he became enraged. He and appellant Hegney, who was staying with Smitty, went to Stefano's house the next night to get revenge. Smitty found Stefano and his fiancée, Penny Reid, in their bedroom. Smitty produced some handcuffs and ordered Stefano to put them on, but Stefano refused. Smitty then shot Stefano in the head and shot Reid through the hand. Reid fell forward on the bed and pretended to be dead. As she lay there, she heard Smitty say, "They're dead in the bedroom. Kill them all." Thomas Young, Wendy James, and David Bostic had been sleeping in the living room before the intruders arrived. Hegney shot two of them and Smitty shot the third.

Because Penny Reid lived, she was able to identify Smitty as the one who had shot her and Stefano. In a dying declaration to a police officer, Bostic identified Hegney as having been one of his attackers. State murder charges were filed against Hegney, but for reasons not evident in the record of this case those charges were later dismissed with prejudice.

*b. The Narcotics Offenses*

In December of 1985, Hegney sold cocaine to an undercover detective, Debra Slocum. He told Slocum that he could get her any-

thing she wanted, and that if she wanted something, she should call the Outlaws' clubhouse and say that she needed to see him. On three occasions Hegney sold cocaine to Slocum in amounts varying from one gram to four and one-half grams.

### 3. Donald Joe Sears

The jury convicted Sears of the substantive RICO violation charged in Count I and of the RICO conspiracy charged in Count II. In doing so, the jury found that the government had proven all three predicate acts charged against Sears. Those predicate acts are described below.

#### a. The Murder of Naomi Sinoqub

The murder of Naomi Sinoqub and Sears's role in it are discussed in part II.B.1.c., *supra*.

#### b. The Narcotics Offenses

In 1980 Sears was sent to Illinois to investigate whether the Hell's Angels were attempting to begin a chapter there. Sears ran out of money during his trip, and he asked two other Outlaws to come north with marijuana and cocaine so that he could sell it to finance the rest of his trip. In a different incident, Sears was arrested and pleaded guilty in 1983 for possession of cocaine in Georgia.

### 4. Michael Lee Cave

The jury convicted Cave of the substantive RICO violation charged in Count I and of the RICO conspiracy charged in Count II. In the course of doing so, the jury found that the government had proven all six predicate acts charged against Cave. Those six predicate acts are described below.

#### a. The Extortion of Serge Seguin

In February of 1981, Cave and another Outlaw encountered Serge Seguin in a local bar. Seguin was not an Outlaw, but he bore a tattoo that resembled the Outlaw "Charlie" logo—a skull and crossed pistons. The Outlaws started to harass Seguin and they told him that he would have to have the tattoo removed or covered. When Seguin left the bar, the Outlaws followed him. Out in the parking lot, one of them held Seguin, while the other attempted to carve his tattoo off with a knife. A policeman approached the men and broke up the fight. The Outlaws followed Seguin to another bar, and when he left that bar, they again followed him. Cave and the other Outlaw jumped Seguin, threw him to the ground, and kicked him in the head and ribs. Cave was arrested on assault charges based on this incident, but failed to appear in court.

#### b. The Extortion of Iris Geoghagen

After Nolan purchased Geoghagen, but before he got out of prison, Geoghagen stayed at Nolan's house in Fort Lauderdale. Cave was also living at the house and was instructed by Nolan to watch over Geoghagen. Geoghagen was having a hard time finding a job as a topless dancer, and Cave told her to get a job as a nude dancer. She told him she was uncomfortable dancing totally nude, and Cave told Geoghagen that he was going to put a dog collar around her neck and make her dance around the house naked until she felt comfortable. On another occasion Geoghagen went to Key West to visit a friend. When she got back Cave hit her and said if she ever ran away again he would find her mother, anally sodomize her, and take pictures of it.

#### c. The Narcotics Offenses

When Cave failed to appear on the assault charges relating to the Serge Seguin incident, his bond estreated and the bondsman lost approximately $20,000. The Outlaws regularly used this bondsman, and the members of the chapter feared the loss of his services, so they pressured Cave to repay the money. Cave, who was hiding in Indiana, began manufacturing PCP in order to pay off the debt to the bondsman. Cave sold the PCP, as well as marijuana, and sent the money to the South Florida Outlaws so that they could make the payments to the bondsman. Law enforcement authorities raided the Indiana PCP lab in July of 1982, but they did not find Cave. He eventually went back to Florida where he continued his narcotics trafficking. On at least two occasions in

November of 1983 and March of 1984, Cave sold methaqualone (quaaludes) to an Outlaws' associate in South Florida.

### 5. Timothy Kevin Duke

The jury found Duke guilty only of the RICO conspiracy charged in Count II. In the course of doing so, the jury found that of the three predicate acts charged against Duke, the government had proven beyond a reasonable doubt two of them. Those two predicate acts are discussed below.

#### a. *The Murder of Mary Lou Rodriguez*

In early 1980 Mary Lou Rodriguez was spending a lot of time with the Outlaws, including Duke. On March 26, 1980, someone slashed the tires of Rodriguez's car. She asked some of the Outlaws to help her settle the dispute. When the problem was not resolved to her satisfaction, Rodriguez became angry. Back at Duke's house, Rodriguez and Duke got into an argument and she stormed out. Duke told the other Outlaws at the house that Rodriguez was going to "rat him out," and that he was going to kill her. Duke ripped an unused telephone cable off of the base board which he said he would use to strangle Rodriguez.

Later that same evening Rodriguez returned to Duke's house. An Outlaw named Hawkins said that he wanted to have sex with Rodriguez before Duke killed her. After Hawkins was through with Rodriguez, she went into the bathroom. Duke followed her in and started to strangle her with the telephone cord. When he thought Rodriguez was dead he dropped her to the floor. But when Duke released his grip, he heard Rodriguez's lungs fill with air again, so he ran to retrieve a spear gun from his bedroom. Duke returned to the bathroom with the spear gun and shot Rodriguez through the head. Duke kept her corpse in a trailer on his property for several days, and then finally had Hawkins dispose of it. Before dumping Rodriguez's body in a canal, Hawkins dismembered the head, feet, and one hand and buried the severed parts in an undiscovered location. The body was found in the canal shortly thereafter, and Duke left the state soon after that. No state charges were ever filed as a result of the murder.

#### b. *The Narcotics Offenses*

In 1980 Duke distributed cocaine to at least one other member of the South Florida Outlaws.

### 6. James Walter Starrett

The jury convicted Starrett only of the RICO conspiracy charged in Count II. In the course of doing so, the jury found that of the five predicate acts charged against Starrett, the government had proven beyond a reasonable doubt four of them. Those predicate acts are described below.

#### a. *The Susan Bacon Murder*

Susan Gail Bacon was present at an Outlaw party held at Starrett's house in December of 1970. Bacon got into an argument with one of the Outlaws and she slapped him. When Starrett saw this, he hit her several times across the face with the back of his hand and kicked her in the head. Later in the evening, some of the Outlaws took Bacon into a bedroom to be "trained." Afterward, someone offered to drive Bacon home, but she announced that she would rather be driven to the police station so that she could report what had happened to her that night. Upon hearing this, Starrett stated that he was going to "feed her to the gators." Starrett and Eugene Shockey, a non-Outlaw, drove Bacon to a remote area and shot her twice in the chest at close range—once with a shotgun, and once with a handgun.[8] Starrett was convicted in state court for the murder, but during his incarceration, he escaped from a prison hospital and fled to Canada with the aid of several Outlaws, including appellant Sears.

#### b. *The Narcotics Offenses*

Starrett eventually returned to the United States and surrendered to the authorities.

---

**8.** There is conflicting testimony about who actually shot Bacon. Starrett said Shockey did it, and Shockey said Starrett did it.

After he was released from prison, Starrett became a trusted drug courier for two other Florida chapters of the Outlaws. Starrett transported marijuana to Illinois and to Wisconsin in 1979 or 1980, and he transported quaaludes, cocaine, and speed to Oklahoma in 1980 for distribution to other Outlaws. The delivery of narcotics to Oklahoma was not successful, because shortly after delivery the drugs were seized by law enforcement. The other Outlaws held Starrett partially responsible for the loss. In February of 1981, Starrett transported approximately one hundred pounds of marijuana to Arizona for Nolan, part of which was lost. Starrett eventually left the Outlaws in bad standing due to these and other problems.

## III. DISCUSSION

### A. SUFFICIENCY OF THE EVIDENCE ISSUES

■ All of the appellants except Starrett argue that the district court erred in refusing to grant their Rule 29 motions. "When evaluating a sufficiency of the evidence claim, we must view the evidence in the light most favorable to the government, drawing all reasonable inferences in favor of the jury's verdict." *United States v. Church*, 955 F.2d 688, 693 (11th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 233, 121 L.Ed.2d 169 (1992). "We must determine on review whether a reasonable jury could have found that the evidence established the appellants' guilt beyond a reasonable doubt...." *United States v. Russo*, 796 F.2d 1443, 1455 (11th Cir.1986). In reviewing the sufficiency of the evidence, we have held that "[t]he evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." *United States v. Hernandez*, 896 F.2d 513, 517 (11th Cir.) (citation and quotation marks omitted), *cert. denied*, 498 U.S. 858,

111 S.Ct. 159, 112 L.Ed.2d 125 (1990). "In reviewing conspiracy convictions, the question is whether there is substantial evidence to support the verdicts." *Russo*, 796 F.2d at 1455.

In evaluating the sufficiency of the evidence contentions, we begin with a discussion of the elements the government was required to prove in order to convict.

### 1. The Substantive RICO Count

■ To establish a violation of 18 U.S.C. § 1962(c), the government must prove: (1) the existence of an enterprise;[9] (2) that the enterprise affected interstate commerce; (3) that the defendants were employed by or associated with the enterprise; (4) that the defendants participated, either directly or indirectly, in the conduct of the affairs of the enterprise; and (5) that the defendants participated through a pattern of racketeering activity. *United States v. Kotvas*, 941 F.2d 1141, 1143–44 (11th Cir.1991), *cert. denied*, — U.S. ——, 113 S.Ct. 982, 122 L.Ed.2d 135 (1993); *United States v. Young*, 906 F.2d 615, 618–19 (11th Cir.1990); *Russo*, 796 F.2d at 1455. Section 1961(5) provides that a " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after [October 15, 1970] and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C.A. § 1961(5) (West 1984). The statute provides a list of numerous state and federal offenses that can be charged as predicate acts of racketeering, including the following: murder, kidnapping, extortion, and dealing in a controlled substance. 18 U.S.C.A. § 1961(1)(A) & (D) (West Supp.1995).

The appellants focus their arguments on the fourth and fifth elements of the substantive RICO offense. None of them challenges the sufficiency of the evidence to prove the first three elements.

---

**9.** Section 1961(4) provides that the term " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C.A. § 1961(4) (West 1984). In this case, the enter- prise specified in Count I, the substantive count, is the South Florida chapter of the Outlaw Motorcycle Club. The enterprise specified in Count II, the conspiracy count, is the Outlaw Motorcycle Club, the national organization of which the South Florida chapter is a local chapter.

■ As to the fourth element, courts have struggled with the language in the RICO statute requiring the defendant "to conduct or participate, directly or indirectly, in the conduct of [the] enterprise's affairs ...." 18 U.S.C.A. § 1962(c) (West 1984). In *Reves v. Ernst & Young*, —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Supreme Court recently resolved a split among the circuits regarding the interpretation of this language. *Reves* held that civil RICO liability should not be extended to an outside accounting firm which had provided services for a RICO enterprise. *Id.* In doing so, the *Reves* Court addressed the issue of "whether one must participate in the operation or management of the enterprise itself to be subject to liability under this provision," as two circuits had previously held. *Id.* at ——, ——, 113 S.Ct. at 1166, 1169. After dissecting the language of § 1962(c), the Court adopted the operation or management test, holding that "[i]n order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Id.* at ——, 113 S.Ct. at 1170. The Court also said, however, that "the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required." *Id.* (footnote omitted). In addition, the Court stated that "liability under § 1962(c) is not limited to upper management," and that "[a]n enterprise is 'operated' ... also by lower-rung participants in the enterprise who are under the direction of upper management," or by "others 'associated with' the enterprise who exert control over it ...." *Id.* at ——, 113 S.Ct. at 1173. The Court declined to decide "how far [liability under] § 1962(c) extends down the ladder of operation." *Id.* at ——, 113 S.Ct. at 1173 n. 9.

Although *Reves* arose in the civil RICO context, a number of cases in other circuits have since applied the operation or management test in the criminal RICO context. *E.g., Napoli v. United States*, 45 F.3d 680, 683 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 1796, 131 L.Ed.2d 724 (1995); *United States v. Wong*, 40 F.3d 1347, 1374 (2d Cir. 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1968, 131 L.Ed.2d at 858 (1995); *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1161, 130 L.Ed.2d 1116 (1995); *United States v. Viola*, 35 F.3d 37, 43 (2d Cir.1994); *United States v. Thai*, 29 F.3d 785, 816 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 456, 130 L.Ed.2d 364 (1994); *but see United States v. Quintanilla*, 2 F.3d 1469, 1484 (7th Cir.1993) (holding that *Reves* test does not apply to conviction for RICO conspiracy). We join those other circuits and conclude that the *Reves* operation or management test applies to criminal RICO cases such as this one.

■ The fifth RICO element—that the defendants participated in the enterprise "through a pattern of racketeering activity"—has two components: (1) that the defendants' predicate acts were related to the enterprise charged; and (2) that the predicate acts formed a pattern. *See, e.g., United States v. Carter*, 721 F.2d 1514, 1527 (11th Cir.), *cert. denied*, 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). We discuss these components separately.

The first component of the fifth RICO element is that the defendant's predicate acts must be related to the enterprise charged in the indictment. *See Carter*, 721 F.2d at 1527; *Thai*, 29 F.3d at 815. We will call this component the "relationship requirement." Although this Court has not defined its exact contours, we have refused to require that the predicate acts affect the everyday operations of the enterprise:

Therefore, we hold that ... proof of an effect upon the common, everyday affairs of the enterprise is not the minimum required to establish a relation between the enterprise and the racketeering activity, and that proof that the facilities and services of the enterprise were regularly and repeatedly utilized to make possible the racketeering activity also establishes the conduct of the affairs of the enterprise

"through" a pattern of racketeering activity.

*Carter,* 721 F.2d at 1527.[10]

The second component of the fifth RICO element is that the predicate acts must actually form a pattern. The Supreme Court has held that in order to prove this pattern, the government must prove that the predicate acts are related to each other and have continuity. *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14; *see also Jones v. Childers,* 18 F.3d 899, 911 (11th Cir.1994); *Cox v. Administrator U.S. Steel & Carnegie,* 17 F.3d 1386, 1397 (11th Cir.), *modified on other grounds,* 30 F.3d 1347 (11th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995); *Church,* 955 F.2d at 693–94. Predicate acts are related to each other if they "'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14 (quoting Title X of the Organized Crime Control Act of 1970, 18 U.S.C. § 3575(e)); *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 240, 109 S.Ct. 2893, 2901, 106 L.Ed.2d 195 (1989). Predicate acts demonstrate continuity if they are either "a closed period of repeated conduct," or "past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. at 2902. The Supreme Court has explained:

> A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates

extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement .... Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

*Id.* at 242, 109 S.Ct. at 2902.

### 2. The RICO Conspiracy Count

To establish a RICO conspiracy violation under 18 U.S.C. § 1962(d), the government must prove that the defendants "objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise through the commission of two or more predicate crimes." *Russo,* 796 F.2d at 1455 (citation and quotation marks omitted); *see also United States v. Gonzalez,* 921 F.2d 1530, 1540 (11th Cir.), *cert. denied,* 502 U.S. 860, 112 S.Ct. 178, 116 L.Ed.2d 140 (1991); *United States v. Elliott,* 571 F.2d 880, 902 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). The focus is on the agreement to participate in the enterprise through the pattern of racketeering activity, not on the agreement to commit the individual predicate acts. "A RICO conspiracy differs from an ordinary conspiracy in two respects: it need not embrace an overt act, and it is broader and may encompass a greater variety of conduct." *United States v. Pepe,* 747 F.2d 632, 659 (11th Cir.1984) (footnotes omitted).

---

**10.** Other circuits that have explored this relationship requirement have held it may be satisfied by showing either that the defendant was enabled to commit the predicate offenses "solely by virtue of his position in the enterprise" or that the predicate offenses are related to the activities of the enterprise. *See, e.g., Thai,* 29 F.3d at 815; *United States v. Locascio,* 6 F.3d 924, 943 (2d Cir. 1993), *cert. denied,* — U.S. —, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994); *United States v. Yarbrough,* 852 F.2d 1522, 1544 (9th Cir.), *cert. denied,* 488 U.S. 866, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988); *cf. United States v. Welch,* 656 F.2d 1039, 1062 (5th Cir.1981) (holding that § 1962(c) requires "sufficient nexus between the racketeering activities and the affairs of the enterprise" and rejecting requirement of benefit to enter-

prise), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982); *United States v. Grubb,* 11 F.3d 426, 439 (4th Cir.1993) (rejecting as part of requirement for relatedness that racketeering activity benefit RICO enterprise); *United States v. Crockett,* 979 F.2d 1204, 1213 (7th Cir.1992) ("To establish a nexus, it is required that (1) [t]he defendant must have committed the racketeering acts; (2) the defendant's position in or relationship with the enterprise facilitated the commission of the acts; and, (3) the acts had some effect on the enterprise. Effect on the enterprise is established by proof that the racketeering acts affected the enterprise in some fashion." (citation and quotation marks omitted)), *cert. denied,* — U.S. —, 113 S.Ct. 1617, 123 L.Ed.2d 176 (1993).

 This Court has held that the government may prove a defendant's agreement in two ways: "(1) by showing an agreement on an overall objective, or (2) ... by showing that a defendant agreed personally to commit two predicate acts and therefore to participate in a 'single objective' conspiracy." *Church*, 955 F.2d at 694 (citations and quotation marks omitted); *see also United States v. LeQuire*, 943 F.2d 1554, 1562 (11th Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992). The government can prove an agreement on an overall objective "by circumstantial evidence showing that each defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity." *Gonzalez*, 921 F.2d at 1540 (quotation marks omitted). If the government proves an agreement on an overall objective, then it is "not necessary that the defendant agree to personally commit two predicate acts ...." *Id.* Regardless of the method used to prove the agreement, "the government does not have to establish that each conspirator explicitly agreed with every other conspirator to commit the substantive RICO crime described in the indictment, or knew his fellow conspirators, or was aware of all the details of the conspiracy." *Pepe*, 747 F.2d at 659. "That each conspirator may have contemplated participating in different and unrelated crimes is irrelevant." *Id.* at 659–60.

### 3. Analysis of Appellants' Arguments
#### a. Nolan

The jury found that the government had proven thirty-four predicate acts against Nolan, seventeen times the minimum number for the RICO pattern requirement. Nolan challenges his convictions for both the substantive violation and for the RICO conspiracy. We will address Nolan's arguments regarding the two convictions separately.

#### (i) Nolan's Substantive RICO Count Arguments

 Nolan's insufficiency of the evidence argument regarding his conviction on Count I, the substantive RICO count, focuses on the predicate acts that occurred while he was living in Arizona, because those are the only ones that fall within the statute of limitations. Nolan would have this Court deem those predicate acts insufficient to support his conviction, arguing that they do not meet the fourth element's operation or management test, and that they do not establish the fifth element's relationship and pattern requirements. In addition, Nolan contends that, although he may have engaged in isolated criminal acts in Arizona, these acts do not amount to participation in the operation or management of the South Florida Outlaws, which is the enterprise specified in the substantive RICO charge. Therefore, Nolan argues, the Arizona predicate acts may not be used to support his substantive RICO conviction. If the Arizona predicate acts cannot be used to support the substantive RICO conviction, then Nolan contends that the conviction must be reversed because none of the other predicate acts charged in the indictment occurred within the RICO five-year statute of limitations. Although the RICO statute itself contains no statute of limitations for either civil actions or criminal prosecutions, we have held that the five-year statute of limitations prescribed in 18 U.S.C. § 3282 applies to RICO prosecutions. *E.g., United States v. Coia*, 719 F.2d 1120, 1124 (11th Cir.1983), *cert. denied*, 466 U.S. 973, 104 S.Ct. 2349, 80 L.Ed.2d 822 (1984). The limitations period is measured from the time the crime is completed. *Id.* Because the "crime" proscribed by § 1962(c) is "the individual patterns of racketeering engaged in by a defendant," *United States v. Persico*, 832 F.2d 705, 714 (2d Cir.1987), *cert. denied*, 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988), the crime is completed, and thus the statute of limitations begins to run, "from the date of the last act of racketeering activity alleged in the indictment and proved at trial." *United States v. Bethea*, 672 F.2d 407, 419 (5th Cir.1982); *see generally Toussie v. United States*, 397 U.S. 112, 114, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970) ("The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions."). Therefore, to bring the crime within the statute of limi-

tations under § 1962(c), the government need only prove that at least one predicate act was committed within five years of the date the defendant was charged in the indictment. *See Pepe,* 747 F.2d at 663 n. 55; *Wong,* 40 F.3d at 1367; *United States v. Torres Lopez,* 851 F.2d 520, 522 (1st Cir. 1988), *cert. denied,* 489 U.S. 1021, 109 S.Ct. 1144, 103 L.Ed.2d 204 (1989).

Nolan was indicted on June 3, 1986; therefore, at least one of Nolan's predicate acts must have occurred after June 3, 1981, in order for the substantive RICO prosecution to be within the statute of limitations. Eight of the predicate acts that the jury found had been proven against Nolan occurred after June 3, 1981. Thus, if any two of Nolan's thirty-four predicate acts establish the required RICO elements, then Nolan's RICO conviction is due to be affirmed. Having reviewed the record in the light most favorable to the government, as we must, we conclude that there is ample evidence from which a reasonable jury could find Nolan guilty of a substantive RICO violation under § 1962(c).

■ Although Nolan does not contest the existence of the South Florida Outlaws charged as the RICO enterprise in Count I, the substantive count, much of his argument reflects too narrow an interpretation of the definition of enterprise. That count defines the enterprise as "[t]he South Florida Chapter of the Outlaw Motorcycle Club ... a group of individuals associated in fact ...." The Supreme Court has held that there are two kinds of RICO enterprises: (1) a legal entity, such as a partnership or corporation; and (2) "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 581–83, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981); *see also Church,* 955 F.2d at 697. The government may prove a RICO enterprise "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528; *see also Church,* 955 F.2d at 698 ("This circuit has

held that proof of an association's devotion to making money from repeated criminal activity demonstrates an enterprise's common purpose of engaging in a course of conduct, regardless of whether the criminal activity is diverse." (citation and quotation marks omitted)). The South Florida Outlaws enterprise falls under the second category of enterprise—"a group of persons associated together for a common purpose of engaging in a course of conduct." *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2528.

■ Nolan places too much emphasis on the internal rules and rituals of the club in his argument about the scope of this enterprise. Although rules and rituals may help prove the existence of a group of individuals associated for a common purpose of engaging in a course of conduct, they do not themselves limit who may or may not be held liable under RICO. Here, for example, the enterprise consists of not merely the patchwearing members of the South Florida chapter, but also anyone else who is associated in fact with that chapter and who engages in the required racketeering conduct.

■ We turn now to a discussion of the whether the government established the fourth substantive RICO element—that the defendant participated, either directly or indirectly, in the conduct of the affairs of the enterprise—and the *Reves* operation or management test which is applicable to that element. Five of Nolan's eight Arizona predicate acts involved the knowing and intentional use of a communication facility in the perpetration of a felony in violation of 21 U.S.C. § 843(b); one predicate act was for transporting Karen Ballering across state lines for the purpose of prostitution in violation of 18 U.S.C. §§ 2421 and 2422;[11] and the other two predicate acts were for conspiracy to possess with intent to distribute cocaine and marijuana in violation of 21 U.S.C. § 841(a)(1). The telephone conversations and wire transfer that formed the basis for the five predicate acts involving communication facilities were between Nolan and

---

11. At Nolan's request, Nail purchased Karen Ballering from an Orlando probationary Outlaw

known as "Crazy Joe" Spaziano. Nolan then bought Ballering from Nail for $350.

Nail, an Outlaw from Florida.[12] The conspiracy to possess with intent to distribute cocaine was also between Nolan and Nail, and the conspiracy involving marijuana was between Nolan, Starrett, who was a South Florida Outlaw, and an Outlaw named Stitch, who was the president of the South Florida Outlaws at the time. All of these transactions were initiated by Nolan, and through these transactions Nolan had some part in directing the affairs of the South Florida Outlaws.

■■■ We hold that the jury was neither limited to a consideration of the Arizona predicate acts in particular, nor to any or all of the predicate acts in general, in determining whether Nolan participated in the operation or management of the South Florida Outlaws. The jury was entitled to consider in its entirety all circumstantial evidence of Nolan's participation in the South Florida Outlaws. In addition to the predicate act evidence discussed above, the government presented ample evidence from which the jury could conclude that Nolan continued to participate in the South Florida Outlaws even after he left for Arizona. Before he moved to Arizona, Nolan purchased Iris Geoghagen from another Outlaw to provide a steady source of income for him. A South Florida Outlaw by the name of Preacher accompanied Nolan to serve as Nolan's body guard in Arizona. Several different South Florida Outlaws visited Nolan in Arizona. Nolan had told Geoghagen that he was going to bring his South Florida associates out to Arizona gradually to establish a satellite chapter of the South Florida Outlaws. In addition, the government introduced numerous tape recordings of conversations between Nolan and members of the South Florida chapter; some of the conversations were related to the Arizona predicate acts, and some of them were not. In one Outlaw's opinion, the reason Nolan went to Arizona was because of his parole terms, and Nolan told Geoghagen of his plans to return to South Florida once he finished his parole. Not one witness testified

that Nolan had ceased being a member of the South Florida chapter, whereas several witnesses testified that he had remained a member of the South Florida Outlaws while residing in Arizona.

Viewing the record in its entirety, we conclude that a reasonable jury could find that Nolan continued to associate in fact with the South Florida Outlaws and that his association included some part in directing the affairs of that enterprise. Although the Supreme Court has yet to delineate the exact boundaries of the operation or management test, we are confident that Nolan falls within those boundaries. We therefore hold that the government presented sufficient evidence to satisfy the *Reves* operation or management test, and thus the government established the fourth element of a substantive RICO violation.

■■■ We must next determine whether the government's evidence established the fifth RICO element, that the defendant's participation in the enterprise was through a pattern of racketeering activity. Even if we were to focus solely on the predicate acts that Nolan committed within the statute of limitations period while he was in Arizona, those eight predicate acts establish both the relationship component and pattern component of the fifth RICO element.

In regard to the relationship component, the requirement that the predicate acts must relate to the enterprise charged, we conclude that the evidence discussed previously, which supports a finding that Nolan participated in the operation or management of the South Florida Outlaws, also supports a finding that Nolan's Arizona predicate acts were related to the South Florida Outlaws. Therefore, the government presented sufficient evidence to establish the relationship component of the fifth RICO element.

Next, we must determine whether the government presented sufficient evidence to prove the pattern component of the fifth

---

12. Nail began his Outlaw membership in the South Florida chapter, but transferred to the Orlando chapter in the mid–1970s. Nail testified about his continued and frequent dealings with Nolan and the South Florida Outlaws, as well as

his loyalty to Nolan as his "boss." Thus, Nail continued to be "associated in fact" with the South Florida Outlaws even though he wore the patch of another chapter.

RICO element—i.e., that the predicate acts were related to one another (as distinguished from being related to the enterprise), and that they exhibited continuity. *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14. The Arizona predicate acts are related to one another. Four of the predicate acts share the purpose of facilitating illegal prostitution, and the other four predicate acts share the purpose of furthering narcotics distribution. In addition, seven of these eight predicate acts involve the same participants—Nolan and Sam Nail. As to the continuity requirement, the four Arizona predicate acts of narcotics distribution also satisfy the Supreme Court's definition of continuity. These predicate acts constituted "past conduct that by its nature projects into the future with the threat of repetition," *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. at 2902, because Nolan and Nail had agreed to a scheme whereby Nail would supply Nolan with cocaine on an on-going basis. *E.g., Church*, 955 F.2d at 694 (defendant's offer to provide as much cocaine in the future as the buyer wanted established threat of continuity even though defendant's two predicate acts spanned only three months). Furthermore, because the "pattern" consists of all of the predicate acts committed by a defendant, and because only one of the predicate acts in a pattern must occur within the statute of limitations period, the jury in this case was entitled to consider the pre-Arizona predicate acts proven against Nolan in determining whether the government had established the fifth RICO element's pattern requirement. Viewed in context with Nolan's numerous pre-Arizona predicate acts, his Arizona predicate acts clearly exhibit the relationship plus continuity needed to prove a pattern of racketeering activity. *H.J. Inc.*, 492 U.S. at 239, 109 S.Ct. at 2900.

In summary, we hold that the government presented sufficient evidence to establish the fourth and fifth elements of a substantive RICO conviction. The government established that Nolan participated in the operation or management of the South Florida Outlaws as *Reves* requires in order to prove the fourth RICO element. In addition, the government established the two components of the fifth RICO element: the government presented sufficient evidence to prove that the predicate acts were related to the enterprise charged, and it presented sufficient evidence to prove the necessary pattern. Therefore, we conclude that the government's evidence is sufficient to support Nolan's substantive RICO conviction under § 1962(c).

### (ii) Nolan's RICO Conspiracy Count Arguments

█ Having analyzed Nolan's conviction for substantive RICO, we now turn to his conviction under § 1962(d) for RICO conspiracy. Nolan argues that the *Reves* operation or management test should apply to his RICO conspiracy conviction, and that the government did not prove that he participated in the operation or management of the national Outlaw Motorcycle Club, which is the enterprise charged in Count II, the conspiracy count. In addition, Nolan contends that the government failed to prove that his predicate acts were related to that national organization.

█ In deciding whether the government's evidence was sufficient to support Nolan's RICO conspiracy conviction, we must determine whether there was substantial evidence from which the jury could find that Nolan manifested an agreement to participate in the American Outlaws Association through a pattern of racketeering activity. *Russo*, 796 F.2d at 1455. The jury could infer from the following evidence that Nolan manifested an agreement to participate in the national organization through a pattern of racketeering activity: Nolan had been the president of both the regional and the local Outlaw organizations; Nolan had been one of the four original Outlaws to establish an Outlaw chapter in Florida; Nolan initiated an aggressive membership recruitment drive to help solidify the Outlaws' position as one of the four largest national motorcycle clubs; and Nolan himself committed thirty-four predicate acts related to the Outlaws. Furthermore, we agree with the Second and Seventh Circuits that the Supreme Court's *Reves* test does not apply to a conviction for RICO conspiracy. *See Napoli*, 45 F.3d at 683–84; *Quintanilla*, 2 F.3d at 1484. Thus,

we find that the government's evidence was sufficient to support Nolan's conviction for RICO conspiracy under § 1962(d).

### b. Hegney, Sears, and Cave

Hegney, Sears, and Cave also contend that the government failed to prove the fourth and fifth substantive RICO offense elements—that they participated in the conduct of the affairs of the enterprises charged through a pattern of racketeering activity. The jury found that the government had proven Hegney committed three predicate acts of narcotics distribution and five predicate acts related to the Stefano murders. The jury found that the government had proven Sears committed two predicate acts of narcotics distribution and one predicate act of murder. Finally, as to Cave, the jury found that the government had proven one predicate act of extortion against Iris Geoghagen, one predicate act of extortion against Serge Seguin, and four predicate acts of narcotics distribution. After viewing the evidence in the light most favorable to the government, we conclude that there is ample evidence to support the jury's verdicts against Hegney, Sears, and Cave.

 The fourth substantive RICO element was proven, because the predicate acts of each of these three appellants establish that each had some part in directing the affairs of the South Florida Outlaws, the enterprise charged in the substantive count, and that satisfies the *Reves* operation or management test. There was ample evidence in this record that Hegney, Sears, and Cave, like the members of the Green Dragons in *United States v. Wong*, 40 F.3d at 1374, were "thoroughly indoctrinated participants in the criminal activities" of the Outlaws. Moreover, we agree with the First Circuit that one may be liable under the operation or management test by "knowingly implementing decisions, as well as by making them." *Oreto*, 37 F.3d at 750. Hegney's and Sears's knowing implementation of the decision to commit murder qualifies under the *Reves* operation or management test. The murders were for the purpose of preventing witnesses of Outlaw criminal activity from being able to testify against the Outlaws. By permanently silencing the witnesses, Hegney and Sears had some part in directing the affairs of the enterprise.

Moreover, Hegney, Sears, and Cave did not just implement decisions, they made them as well. Hegney initiated the distribution relationship with Debra Slocum after overhearing her conversation with someone else about wanting to find a source for narcotics. Cave set up a PCP lab at his house in Indiana on his own initiative so that he could pay his debt to the Outlaws' bail bondsman. And Sears, along with government witness Thomas Belcher, ordered other Outlaws to deliver narcotics to Illinois so that they could finance their trip, which was for Outlaw business. Although the Supreme Court has not yet decided how far down the ladder of operation to extend RICO liability, we are confident that these appellants do not stand so low on the ladder that they should be excluded from RICO liability.

 All three appellants' predicate acts involving narcotics were clearly related to the enterprise for purposes of proving the fifth RICO element. The government presented numerous witnesses who testified that the South Florida Outlaws regularly used and dealt drugs. This narcotics activity furthered the anti-social lifestyle that is the *raison d'être* of the Outlaw Motorcycle Club. At least one witness testified that the proceeds of narcotics sales contributed to the purchase of an Outlaw clubhouse, which in turn provided a home for numerous members of the club and was where the weekly Outlaw meetings were held. This evidence demonstrates that these acts of narcotics distribution are sufficiently related to the South Florida Outlaws. *E.g., Carter*, 721 F.2d at 1527 (predicate acts found related to legitimate dairy farm enterprise where dairy farm was regularly used as the location for drug smuggling activities). Because the jury found that each of these three appellants had engaged in at least two acts of narcotics distribution, we need not decide whether the other predicate acts were related to the enterprise.

Finally, the predicate acts the jury found these three appellants had committed also satisfy the pattern requirement of the fifth

RICO element. Even if we look only at the narcotics predicate acts, we find that the government proved the required relationship plus continuity for Hegney's three predicate acts. Hegney's three predicate acts of narcotics distribution involved the same participants—Hegney and undercover officer Debra Slocum—and the same kind of narcotics. In addition, Hegney and Slocum followed the same sequence of events leading up to each sale: Slocum would call Hegney at the Outlaw clubhouse and say that she needed to see him, which was the code they had established for her to request narcotics. These predicate acts displayed the required threat of continuity, because Hegney told Slocum that he could get her any narcotics she wanted, and then followed through on that promise three times. *See Church,* 955 F.2d at 694 (holding that defendant's offer to provide as much cocaine in future as buyer wanted established threat of continuity even though defendant's two predicate acts spanned only three months: "[I]t is the association's long-term existence and regular way of doing business that poses the threat of continued racketeering activity.").

Cave's four predicate acts of narcotics distribution and Sears's two predicate acts of narcotics distribution also satisfy the pattern requirement. Cave's predicate acts are all related to one another by the common purpose of paying the Outlaws' bail bondsman and by the involvement of the same Outlaw participants in the transactions. Sears's predicate acts are related to one another because they all involved the same narcotic substance and all occurred at the concerts of a former Outlaw, David Allen Coe. In addition, both Cave's and Sears's predicate acts display the requisite continuity: they are a "series of related predicates extending over a substantial period of time"—two years for Cave and between two and seven years for Sears. *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. at 2902. Thus, the government's evidence was sufficient to establish the fifth RICO element against these three appellants.

We therefore hold that there is sufficient evidence in the record to support Hegney's, Sears's, and Cave's convictions under § 1962(c). We also hold that the jury could have inferred from the evidence in the record against Hegney, Sears, and Cave that they each manifested an agreement to participate in the Outlaw Motorcycle Club through a pattern of racketeering activity, thus supporting their convictions for RICO conspiracy under § 1962(d).

#### c. Duke

Duke makes two arguments for why his § 1962(d) RICO conspiracy conviction must be reversed. First, he contends that the government failed to present sufficient evidence that he agreed to participate in the RICO conspiracy. Second, Duke contends that even if the government proved such an agreement, his conviction must be reversed because he proved that he withdrew from the Outlaws in the spring of 1980, more than five years before the grand jury indicted him in this case. Therefore, he argues, his conviction was time-barred. We reject both contentions.

First, we conclude that the government presented sufficient evidence to establish that Duke agreed and manifested his agreement to participate in the conduct of the national Outlaw Motorcycle Club (the enterprise charged in the conspiracy count) through a pattern of racketeering activity. Indeed, the government proved more than was necessary to establish Duke's agreement to participate in the conspiracy. Even though a defendant need not commit any predicate acts in order to be convicted of RICO conspiracy, *Torres Lopez,* 851 F.2d at 524–25, the government proved Duke did commit two predicate acts.[13] The jury was entitled to infer from Duke's commission of these acts that he agreed to participate in the Outlaws through a pattern of racketeering activity. Furthermore, in addition to proving two of the predicate acts charged, the government presented witnesses who testified

---

**13.** Although a violation of § 1962(c), which defines the substantive offense, requires proof of at least two predicate acts, two predicate acts may not be enough under the circumstances to find a violation of that provision. The jury in this case found that Duke had committed two predicate acts, but did not convict him of the substantive RICO charge.

that Duke bought and sold narcotics with several Outlaws, and that most Outlaws dealt in drugs and "worked" their women as prostitutes. Considering all of this evidence together, the jury was entitled to find that Duke agreed to an overall conspiracy objective as well. *See Church,* 955 F.2d at 694–95. Therefore, the government's evidence was sufficient to prove the elements of Duke's RICO conspiracy violation under § 1962(d).

■■■ Duke further argues, however, that even if we conclude that he agreed to participate in the conspiracy, he proved that he withdrew from the Outlaws more than five years before he was indicted on July 29, 1986. The law of this circuit is that "a conspirator's participation in a conspiracy is presumed to continue until all activity relating to the conspiracy is ceased. Accordingly, [each defendant] is presumed to be a participant for the duration of the conspiracy unless he can overcome the presumption by proving his withdrawal." *LeQuire,* 943 F.2d at 1563–64 (citation omitted). Furthermore, "[w]ith respect to conspiracy statutes that do not require proof of an overt act, the indictment satisfies the requirements of the statute of limitations if the conspiracy is alleged to have continued into the limitations period." *Gonzalez,* 921 F.2d at 1548 (citation and quotation marks omitted). "The conspiracy may be deemed to continue as long as its purposes have neither been abandoned nor accomplished. Furthermore, the conspiracy is presumed to exist until there has been an affirmative showing that it has terminated." *Id.* (citations and quotation marks omitted); *see also Wong,* 40 F.3d at 1367 (no predicate acts within the five-year period required for RICO conspiracy as long as defendant has not withdrawn); *Torres Lopez,* 851 F.2d at 524–25 (same). To establish the affirmative defense of a withdrawal from the conspiracy, the defendant has the substantial burden of proving: (1) that he has taken affirmative steps, inconsistent with the objectives of the conspiracy, to disavow or to defeat the objectives of the conspiracy; and (2) that he made a reasonable effort to communicate those acts to his co-conspirators or that he dis-

closed the scheme to law enforcement authorities. *See LeQuire,* 943 F.2d at 1564; *United States v. Finestone,* 816 F.2d 583, 589 (11th Cir.), *cert. denied,* 484 U.S. 948, 108 S.Ct. 338, 98 L.Ed.2d 365 (1987). *"A mere cessation of activity in the conspiracy is not sufficient to establish withdrawal." Id.* (emphasis added).

■■■ As evidence of his withdrawal from the Outlaws, Duke offers the following: he added a 1980 "out date" to his Outlaw Charlie tattoo; he sold his motorcycle; he joined a church and got a job; and he moved out of Florida and "cut off virtually all contact" with the Outlaws. Even if this evidence is sufficient to satisfy this circuit's first requirement for proving withdrawal from a conspiracy—that he took affirmative steps to disavow the conspiracy—it is insufficient to satisfy the second requirement. Duke has not pointed to any evidence in the record to indicate that he made a reasonable effort to communicate his withdrawal to his co-conspirators, or that he disclosed the Outlaws' criminal schemes to law enforcement. *See LeQuire,* 943 F.2d at 1564.

Prior to becoming a probate with the South Florida Outlaws in 1980, Duke was a member of the Outlaws' Louisville, Kentucky chapter, as evidenced by his Outlaw Charlie tattoo bearing the Louisville "rocker."[14] This tattoo has two dates on it, " '78" on the right side of the skull, and " '80" on the left. Duke contends that this means he became a member of the Outlaws in 1978 and that he left in 1980, and that this "out date" is the normal means by which an Outlaw communicates his withdrawal to the club. However, the government presented testimony from which the jury could have found that the so-called "out date" pertained to the date Duke left the Louisville chapter to go to Florida, not the date he left the Outlaws altogether. Thus, the jury could have concluded that this evidence did not establish Duke's withdrawal from the conspiracy.

Duke has never cooperated with law enforcement regarding the Outlaws' criminal activity, and none of the persons to whom

14. The "rocker" is the part of the tattoo that resembles a banner above or below the skull and crossed pistons; the name of the chapter appears inside that banner.

Duke claims to have communicated his withdrawal were ever members of, or associated with, the Outlaws. The government presented evidence that on at least one occasion after Duke's purported withdrawal he had an opportunity to tell two South Florida Outlaws that he was through with the club, but he failed to do so. Thomas Belcher testified that he and another Outlaw saw Duke in Knoxville, Tennessee, in 1982 and that Duke gave Belcher some cocaine. Duke presented no evidence that he said anything to Belcher or the other Outlaw present about having left the Outlaws. Because Duke did not present any evidence that he disclosed any Outlaw activities to law enforcement or made a reasonable effort to communicate his withdrawal *to his co-conspirators,* the jury was entitled to reject Duke's withdrawal defense. *See LeQuire,* 943 F.2d at 1564.

## B. JURY INSTRUCTION ISSUES

■ Nolan contends that the district court abused its discretion by refusing to give his proposed jury instructions regarding the definition of "association" with a RICO enterprise, the requirements for establishing a pattern of racketeering activity, and the requirements for a RICO conspiracy. We review a district court's rejection of proposed jury instructions for an abuse of discretion. *United States v. Maduno,* 40 F.3d 1212, 1215 (11th Cir.1994).

■ The district court's refusal to incorporate a requested jury instruction will be reversed only "if the proffered instruction was substantially correct, the requested instruction was not addressed in charges actually given, and failure to give the instruction seriously impaired the defendant's ability to present an effective defense." *Id.* "[T]he district court has broad discretion in formulating its charge as long as the charge accurately reflects the law and the facts." *United States v. Winchester,* 916 F.2d 601, 604 (11th Cir.1990) (citation and quotation marks omitted).

■ Nolan's proposed jury instruction regarding the definition of association with an enterprise provided, in relevant part:

In order to determine whether Nolan's position within the South Florida Chapter of the Outlaw Motorcycle Club constituted association with the enterprise alleged, you must decide whether any of the predicate acts alleged that have been proven beyond a reasonable doubt would not have occurred but for Nolan's leadership position or that his leadership position assisted him in the commission of those illegal acts.

. . . . .

Participation in a particular lifestyle or an intolerance or acquiescence to the criminal activities of other members of the legal entity called the South Florida Chapter of the OMC is not sufficient to establish beyond a reasonable doubt the defendant's association with the enterprise alleged. Evidence that a defendant adheres to a particular belief system that included a general disregard and rejection of societal mores does not, in itself, constitute proof beyond a reasonable doubt that that defendant was furthering the affairs of the enterprise alleged absent proof that the belief system adhered to determined or compelled his actions.

This rejected instruction contains incorrect statements of the law.

In order to find that Nolan associated with the enterprise, the jury was not required, as the proposed instruction stated, to find that the predicate acts attributed to Nolan would not have occurred but for his leadership position, or that his leadership position assisted him in the commission of those illegal acts. The phrasing of this instruction implies that those are the only two ways that the government could prove that Nolan associated with the enterprise. As the Supreme Court made clear in *Reves,* the defendant need not occupy a *leadership* position in order to be associated with the enterprise; lower rung participants and outsiders who conduct the affairs of the enterprise may be associated with the enterprise as well. *Reves,* —— U.S. at ——, n. 9, 113 S.Ct. at 1173 n. 9. In order for the jury to find that Nolan associated with the enterprise, the jury need merely find that he was "*aware* of at least the general existence of the enterprise named in the indictment." *United States v. Console,* 13 F.3d 641, 653

(3d Cir.1993) (citations and quotation marks omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 1660, 128 L.Ed.2d 377 (1994); *see also United States v. Martino,* 648 F.2d 367, 394 (5th Cir. June 1981) ("A defendant must know *something* about his co-defendants' related activities which make up the enterprise, but it is not necessary that he be aware of all racketeering activities of each of his partners in the enterprise."), *cert. denied,* 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982). Because Nolan's proposed instruction does not accurately reflect the Supreme Court's definition of association with an enterprise, the district court correctly refused to adopt it. In addition, the part of this proposed instruction concerning the "rejection of societal mores" is more of an argument, which may be made by counsel to the jury during closing arguments, than an instruction on the law.

 Nolan's proposed jury instruction for the pattern of racketeering activity also contained misstatements of the law. This instruction provided that: "[i]t must be established that the purpose of the enterprise was to conduct its affairs through a pattern of racketeering activity." To the contrary, the government need not prove that the purpose of the enterprise is to conduct its affairs through a pattern of racketeering activity. The enterprise may be a legitimate entity, with a purpose unrelated to criminal endeavors, and nonetheless be a RICO enterprise if those associated with the enterprise participate in its affairs through a pattern of racketeering activity. *E.g., Carter,* 721 F.2d at 1525–26 (legitimate dairy farm used to facilitate drug smuggling and bribery venture constituted RICO enterprise). Therefore, the district court properly refused to give this instruction.

 Finally, Nolan's proposed jury instruction on RICO conspiracy was properly rejected for reasons similar to those just discussed. This proposed instruction included the following passage:

Only if the Government has proven beyond a reasonable doubt that an individual's proven membership or association with the AOA, the OMC and any of its chapters was for the purpose of committing crime or providing a means of facilitating or protecting themselves from the consequences of criminal activity alleged in Count II, can you find that the conspiracy existed.

To prove a RICO conspiracy, it is not necessary for the government to prove that the defendant associated with the enterprise for the purpose of either "committing crime" or "facilitating or protecting [himself] from the consequences of criminal activity . . . ." The focus of the RICO conspiracy statute is not on why the defendant associates with the enterprise, but on what he does, or agrees to do, while associated with it. *Torres Lopez,* 851 F.2d at 524–25. The RICO conspiracy statute does not apply until the defendant manifests his agreement to participate in the conduct of the enterprise's affairs through a pattern of racketeering activity, regardless of his purpose for associating with the enterprise. We conclude that the district court did not abuse its discretion in refusing to give the proposed jury instructions.[15]

## C. VARIANCE ISSUES

 Cave contends that the district court erred in denying his Rule 29 motion for judgment of acquittal based on a variance between the charges alleged in the indictment and the government's proof at trial. Cave argues that the government did not prove the single RICO conspiracy charged in Count II; instead, he contends that the government at best proved multiple conspiracies, and that this variance affected his substantial rights. In *United States v. Watchmaker,* this Court rejected a similar argument, stating that "[b]ecause of the variety of activities which may be undertaken by a criminal enterprise, there are few RICO trials in which such a claim could not be made, and it has been soundly rejected by the courts of this Circuit." 761 F.2d 1459, 1477 (11th Cir. 1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 917 (1986).

 The standard of review for an allegation of variance between the indictment and

---

**15.** Other portions of Nolan's proposed jury instructions discussed in his brief which are not set forth herein were adequately addressed in the charges actually given by the district court.

the proof adduced at trial requires two steps: "First, we must determine whether a material variance did indeed occur; and, second, whether [the appellant] suffered substantial prejudice as a result of the variance." *United States v. Prince,* 883 F.2d 953, 959 (11th Cir.1989); *see also United States v. Reed,* 980 F.2d 1568, 1581 (11th Cir.), *cert. denied,* ––– U.S. –––, 113 S.Ct. 3063, 125 L.Ed.2d 745 (1993); *Church,* 955 F.2d at 697. "No material variance will exist if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment." *LeQuire,* 943 F.2d at 1561.

■ We need not decide if the evidence in this case supports a jury's finding of a single conspiracy, the first prong of the test, because Cave has failed to establish the second prong—that he has been substantially prejudiced by the alleged variance. To establish such prejudice, the defendant must show either (1) that "the proof at trial differ[s] so greatly from the charges in the indictment that the defendant was unfairly surprised and had an inadequate opportunity to prepare a defense," or (2) that due to the number of defendants in the case, and the number of predicate acts charged, there is a substantial likelihood that the jury transferred evidence from one defendant to another. *United States v. Caporale,* 806 F.2d 1487, 1500 (11th Cir.1986), *cert. denied,* 482 U.S. 917, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987). Any variance in this case between the indictment and the proof at trial is not so great as to support a claim of unfair surprise. Furthermore, the fact that the jury actually acquitted Duke and Starrett on the substantive RICO charges is an indication that the jury did not transfer evidence among the defendants. We conclude, therefore, that the district court properly denied Cave's motion for judgment of acquittal.

## D. SEVERANCE ISSUES

■ Appellants Cave, Hegney, and Sears argue that the district court abused its discretion in denying their respective motions for severance. Each contends that the jury was unable to separate the evidence pertaining to him from that pertaining to his co-defendants, and that the spillover effect of the latter caused him to suffer compelling prejudice. Each argues that the evidence pertaining to him was *de minimis* in relation to the rest of the evidence adduced during this year-long trial, and that his convictions resulted from being jointly tried with the more violent defendants. We review rulings on motions for severance for an abuse of discretion. *Watchmaker,* 761 F.2d at 1476.

The Supreme Court has held that "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro v. United States,* ––– U.S. –––, –––, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993). In addition, this Court has placed a heavy burden on a defendant who seeks to obtain a reversal on the basis of the denial of a severance motion:

> [A] showing of compelling prejudice must be made before a trial court's ruling will be viewed as an abuse of discretion. A reviewing court must consider whether the jury could "individualize each defendant in his relation to the mass," that is, whether the jury could avoid cumulating the evidence against all of the defendants and could make individualized guilt determinations. *The jury's ability to reach different verdicts as to different defendants is one factor which weighs in favor of the jury's ability to make individualized determinations and against a finding of abuse in refusing severance.*

*Watchmaker,* 761 F.2d at 1476 (quoting *Kotteakos v. United States,* 328 U.S. 750, 773, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946)) (citations omitted) (emphasis added); *see also LeQuire,* 943 F.2d at 1563. "[T]he Constitution does not guarantee a trial free from the prejudice that inevitably accompanies any charge of heinous group crime; it demands only that the potential for transference of guilt be minimized to the extent possible under the circumstances . . . ." *Elliott,* 571 F.2d at 905.

As in most RICO cases, the strength of the six defendants' connections with the Outlaws varied, as did the number of predicate acts of which they had been accused; however, sufficient evidence existed to prove that each had

participated in the conduct of the South Florida Outlaws by committing at least two predicate acts of racketeering. None of these three appellants have adequately specified the prejudice they suffered as a result of this joint trial. In any event, the district court gave limiting instructions where appropriate, and it inquired of the jurors individually whether they understood those instructions. *See Zafiro,* —— U.S. at ——, 113 S.Ct. at 939 (holding that proper jury instructions cured any possibility of prejudice from joint trial).

Moreover, as was also true in connection with the variance issue, the specific findings of the jury demonstrate that these appellants were not prejudiced by a joint trial. The jury's individual findings reflect that it found that a number of the charged predicate acts had not been proven. The jury also ultimately found both Duke and Starrett not guilty of the substantive RICO charges, which demonstrates that it was able to make individualized determinations of guilt. Those not guilty verdicts, as well as the findings that various predicate acts had not been proven, are compelling evidence that Cave, Hegney, and Sears were not prejudiced by a joint trial. We hold that under these circumstances, the district court did not abuse its discretion in denying appellants' motions for severance.

### E. NEW TRIAL ISSUES

 Nolan contends that the district court erred in denying his motion for a new trial based on newly discovered evidence. We review a ruling on a motion for a new trial based on newly discovered evidence under the abuse of discretion standard. *United States v. Garcia,* 13 F.3d 1464, 1472 (11th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2723, 129 L.Ed.2d 847 (1994). The newly discovered evidence upon which Nolan relies consists of an affidavit by John Askins, the former cellmate of a government witness against Nolan. Askins states in his affidavit that this witness, Ralph Yanotta, had said that he intended to perjure himself when he testified at Nolan's trial. The district court denied Nolan's motion for a new trial, finding Askins's affidavit to be "merely impeaching,"

and thus insufficient to warrant a new trial. We agree.

 When a defendant discovers new evidence after trial that was unknown to the government at the time of trial, a new trial is warranted only if: "(1) the evidence was in fact discovered after trial; (2) the defendant exercised due care to discover the evidence; (3) the evidence was not merely cumulative or impeaching; (4) the evidence was material; and (5) the evidence was of such a nature that a new trial would probably produce a new result." *Id.* at 1472; *see also United States v. Bollinger,* 796 F.2d 1394, 1401 (11th Cir.1986), *modified on other grounds,* 837 F.2d 436 (11th Cir.), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1737, 100 L.Ed.2d 200 (1988); *United States v. Haimowitz,* 725 F.2d 1561, 1574 (11th Cir.1984). Failure to meet any one of these elements will defeat a motion for a new trial. *E.g., United States v. Williams,* 816 F.2d 1527, 1530–31 (11th Cir.1987).

We need not decide whether the evidence in question was "merely impeaching," because Nolan has failed to persuade us that a new trial would probably produce a different result. There was ample evidence apart from Yannota's testimony upon which the jury could base Nolan's RICO convictions. Even if Yannota had provided the only evidence of Nolan's involvement in the Sinoqub and Hell's Angels murders, as Nolan argues, and even if the jury disbelieved Yannota's testimony, Nolan cannot establish that the result of a new trial would probably be different. The jury found that the government had proven Nolan committed dozens of predicate acts in addition to the predicate acts involving these murders. Nolan does not contend that the government would have failed to prove these other predicate acts without Yannota's testimony. Furthermore, Yannota's testimony did *not* provide the only evidence of Nolan's involvement in the murders—T.R. Belcher also testified to his personal knowledge of Nolan's participation in the murders. The district court did not abuse its discretion in denying Nolan's motion for a new trial.

## F. *BRADY V. MARYLAND* ISSUES

Nolan and Starrett make several arguments regarding alleged violations of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), but only Starrett's arguments merit discussion.

### 1. The Missing Ledger Pages

■ Starrett first contends that the government violated *Brady* by withholding pages from a dues ledger that would have helped establish his withdrawal defense. During its case-in-chief, the government introduced into evidence an Outlaw dues ledger that had several pages torn out. Starrett took the stand in his own defense and testified that he left the Outlaws in October of 1980. During its cross-examination of Starrett, the government used photographs of the missing ledger pages for the limited purpose of impeaching Starrett; those ledger pages reflected that Starrett had paid dues in February of 1981, contrary to his testimony that he had quit the Outlaws in October of 1980.

However, Starrett contends that these pages were exculpatory because they also reflected that his name had been crossed out in March of 1981 with the words "out" and "extink" [sic] written next to his crossed out name. Starrett argues that had he been given this evidence prior to his testifying, he would have introduced it in order to help establish that he had withdrawn from the conspiracy and had communicated his withdrawal to his co-conspirators as required by the law of this circuit. Furthermore, Starrett argues that the evidence was material because if the jury had believed that he was out of the club in March of 1981, his prosecution would have been barred by the statute of limitations.

The district court ruled that Starrett could use the ledger pages in any way that he wanted—including interrupting cross-examination to recall any of his defense witnesses—but Starrett made no use of the ledger pages at trial. Starrett contends that introducing the pages to prove he left the club in February or March 1981 after he had already testified that he left the club in 1980 would have done little good, because the evidentiary value of the ledger pages was severely diminished by his inconsistent testimony about when he had left.

■ Under *Brady v. Maryland*, the prosecution is required to disclose to the defense evidence favorable to the accused if the evidence is material to guilt or punishment. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Routly v. Singletary*, 33 F.3d 1279, 1285 (11th Cir.1994). The United States Supreme Court has held that "[i]mpeachment evidence, ... as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). A successful *Brady* claim requires three elements: (1) the prosecution suppressed evidence, (2) the evidence suppressed was favorable to the defense or exculpatory, and (3) the evidence suppressed was material. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97; *Jacobs v. Singletary*, 952 F.2d 1282, 1288 (11th Cir.1992); *Delap v. Dugger*, 890 F.2d 285, 298 (11th Cir.1989), *cert. denied*, 496 U.S. 929, 110 S.Ct. 2628, 110 L.Ed.2d 648 (1990). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, —— U.S. ——, ——, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995) (citation and quotation marks omitted).

We find that Starrett has failed to prove that there was a reasonable probability of a different result had the government turned over the ledger prior to Starrett's testimony. Even if Starrett had been given those pages prior to his testimony, and even if he had never lied on the stand about the date he left the club, the result of this trial would not have been different. The ledger does not establish Starrett's defense of withdrawal. As previously discussed, whether Starrett was a dues-paying, patch-wearing member of the Outlaws does not determine his culpability under RICO. A former member of the Outlaws, or someone who was never a member of the Outlaws, may be convicted of a RICO conspiracy if he agreed to participate

in the Outlaws enterprise through a pattern of racketeering activity.

Starrett was convicted only of RICO conspiracy. In order to convict him of that crime, the jury was required to find that Starrett agreed to participate, directly or indirectly, in the conduct of the Outlaw Motorcycle Club through a pattern of racketeering activity. *See Gonzalez,* 921 F.2d at 1540. Regardless of whether Starrett's standing with any chapter of the Outlaws was in jeopardy, he could still conspire to violate RICO. The question posed by Starrett's withdrawal defense is whether he took affirmative acts to disavow or defeat the conspiracy, and whether he communicated those acts to his co-conspirators, or cooperated with the police. *Finestone,* 816 F.2d at 589. Starrett's continued participation in the criminal activity which he claimed to have disavowed negates his withdrawal defense.

The jury found that the government had proven that Starrett continued to engage in racketeering activity until at least June 17, 1981. From the fact that Starrett had committed a predicate act in June of 1981, the jury was entitled to conclude that he had not withdrawn from the conspiracy as of that date. Under these circumstances, Starrett cannot demonstrate that there is a reasonable probability of a different result had he been given the ledger pages earlier.

### 2. The Rudolph Lunsford Statement

■ Starrett's second *Brady* contention involves evidence pertaining to the murder of Susan Bacon. After Starrett's counsel made an opening statement in which he argued that Starrett had been present at the murder but had not killed Bacon himself, the government provided Starrett with a copy of the transcript from a statement given by Rudolph Lunsford, who had been at Starrett's party the night Bacon was killed. Lunsford stated that Starrett had stayed home that night and that someone named Sommers had killed Bacon. Starrett argues that had his counsel known of Lunsford's statement, he would have employed a different defense strategy, i.e., Starrett would have told a different tale when he testified.

Once again, Starrett has failed to prove a reasonable probability of a different result had he been provided with this statement prior to trial. Starrett had already testified in his state trial for the murder of Susan Bacon that he drove Bacon out to the deserted area, and that he was present when she was shot. If Starrett had attempted to change his story in this trial, the government would have impeached him with his prior sworn testimony. Furthermore, the government presented two witnesses who stated that not only was Starrett present during the shooting of Bacon, but he was the one who shot her. There is an even more fundamental flaw in Starrett's contentions. His contentions presuppose that in judging a *Brady* claim a court should pretend that the defendant did not testify under oath in the same case in a manner inconsistent with his subsequent materiality argument. In other words, the argument goes, we should wipe the slate clean of any tales previously told, and give the defendant another turn at the game. We reject such a "sporting theory of justice." *Brady,* 373 U.S. at 90, 83 S.Ct. at 1198. A trial is not a game of liar's poker. We judge the materiality of evidence that was not presented against all the evidence that was, including the defendant's own testimony.

### IV. CONCLUSION

Having carefully reviewed the record and after considering the appellants' many arguments, we have found no basis for reversal of these convictions. Appellants' convictions and sentences are AFFIRMED.