[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 13, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-15117

_____

D. C. Docket No. 03-00059 CR-5-MCR

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FREDDY J. WILLIAMS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(April 13, 2006)**

Before TJOFLAT and COX, Circuit Judges, and GEORGE[*], District Judge.

COX, Circuit Judge:

From 1999 until 2003, Freddy J. Williams, M.D., who was licensed to practice

medicine in Florida and registered under the Controlled Substances Act, 21 U.S.C. §

_____

[*]Honorable Lloyd D. George, United States District Judge for the District of Nevada, sitting by designation.

801 et seq., operated a clinic in Panama City, Florida. In June 2004, he was convicted, following a jury trial, of 94 crimes, including, most significantly: 56 counts of unlawfully dispensing controlled substances; 2 counts of unlawfully dispensing a controlled substance resulting in death; multiple counts of mail fraud, wire fraud, health care fraud and conspiracy to commit these frauds; and possession of a firearm by a convicted felon.[1] Williams was sentenced, pursuant to the U.S. Sentencing Guidelines ("the Guidelines"), to concurrent terms of life imprisonment on the two counts resulting in death as well as concurrent terms of imprisonment ranging from 60 to 240 months on the remaining 92 counts of conviction. He was also sentenced to a five-year period of supervised release to follow the imprisonment and ordered to pay $2,051,642.16 restitution. He appeals his convictions and sentences. We affirm the convictions and remand for resentencing under the now-advisory Guidelines system.

## I. BACKGROUND

From January 2000 through October 23, 2003, Williams wrote over 21,000 prescriptions for more than two million doses of controlled substances–most for oxycodone (brand names OxyContin and OxyIR).[2] At trial, the Government presented

---

[1] Williams was previously convicted of Medicaid fraud and served twelve months in federal prison. He was released in 1995.

[2] All of the prescriptions discussed in this opinion are prescriptions for controlled substances, as defined and regulated by the Controlled Substances Act. Oxycodone is a Schedule II controlled

the expert testimony of Dr. Parran, a board certified internal medicine physician with subspecialty training in addiction medicine. Parran, who was qualified as an expert in the areas of pain management, addiction medicine, and prescribing controlled substances, testified based on his review of patient files, prescriptions and other documents seized from Williams's clinic. This testimony and the documentary evidence demonstrated that Williams wrote multiple prescriptions on the same day for the same patient, that he wrote prescriptions for over one hundred individuals on whom he maintained no medical chart, that he wrote prescriptions for patients on whom he performed no or very minimal physical examination, that he wrote prescriptions for patients whose behavior and physical appearance indicated that they were addicted to controlled substances or who informed Williams that they had been addicted to controlled substances or illegal drugs in the past, that he wrote prescriptions for patients whose toxicology screens (tests to determine which drugs are in a patient's body) showed that they were not taking the prescribed drugs and were instead taking illegal drugs, that he wrote prescriptions for at least one patient who he had heard was selling the prescribed drugs, that the trend in his prescribing was to increase a patient's dosage and number of pills with each prescription, and that

substance, defined by the statute as a drug with a "high potential for abuse . . . [but] a currently accepted medical use with severe restrictions," abuse of which "may lead to severe psychological or physical dependence." 21 U.S.C. § 812(b)(2).

3

he frequently refilled prescriptions early and replaced "lost" drugs. Parran testified that these practices are not safe and are "not the legitimate practice of medicine." (R.12-165 at 46, 54.) Parran repeatedly stated that prescriptions written to particular patients, "fail[] to meet usual standards of care and appear[] to be for other than legitimate medical purpose." (e.g., R.12-165 at 74, 92, 97, 101, 109.) At times during his testimony, Parran characterized Williams's prescription-writing behavior as "unbelievable," "unimaginable," "unfathomable," "inexcusable," and "abhorrent." (R.12-165 at 89, 92, 101, 116; R.13-166 at 45.) Williams did not object to the admission of any of this testimony.

The evidence further showed that Williams billed insurers (through the mail or by facsimile) for some of the patient visits during which he performed no service other than writing prescriptions for controlled substances and that Williams arranged (also using the mail or facsimile) for patients to enter the OxyContin drug manufacturer's program to provide free OxyContin through the mail to patients, agreeing with those patients to falsify their applications to claim that they had financial need and that Williams was providing his services for free when, in fact, he was charging those patients for visits.

Evidence was also presented that Williams received a kickback of some of these free drugs. Williams maintained a supply of OxyContin in his office and gave these

4

drugs to patients to use "on an emergency basis." While Williams was registered to prescribe controlled substances, he was not registered to possess or dispense controlled substances.

Tara McGavan, an indicted co-conspirator, testified that Williams delivered OxyContin and syringes to her at her home.[3] McGavan and Duane Oxenham, another indicted co-conspirator, testified that they recruited two patients, Mr. and Mrs. M, for Williams and that Williams acknowledged that the Ms were addicted to the OxyContin he was prescribing but said "at least they are not getting [their drugs] from the street." (R.14-167 at 52-53.) Williams did not refer the Ms for drug treatment but rather agreed with Oxenham and McGavan that Oxenham and McGavan should hold the Ms' supply of OxyContin in a lock box in Oxenham and McGavan's home. Oxenham and McGavan did this so that they could make sure that the Ms did not overdose, end up in an emergency room and reveal Williams to be their source for drugs. McGavan testified, "Dr. Williams agreed that that would be in the best interest for [the Ms] and for all of us." (R.14-167 at 55.)

Three of Williams's patients died of drug overdoses. He was charged with dispensing oxycodone resulting in the death of two of the three, Bonnie Ramos and Brian Sanders. Dr. Scheuerman, an expert in forensic toxicology, testified that Ramos

---

[3] OxyContin is a pill, but it can be ground into a powder and snorted or injected to create a stronger high.

died of an overdose of OxyContin (prescribed by Williams) and/or doxepine (an antidepressant prescribed by another doctor). (R.6-163 at 79.) Scheuerman further testified that the amount of OxyContin alone in Ramos's body was enough to cause her death. (R.6-163 at 79, 82.) Sanders died of an OxyContin overdose while injecting himself with drugs prescribed by Williams.

Two firearms were seized during a search, pursuant to warrant, of Williams's residence. One rifle was in Williams's bedroom closet, the other in his son's bedroom.

Williams was convicted on June 16, 2004 and sentenced on September 1, 2004, pursuant to the then-mandatory Guidelines. At the sentencing hearing, the court ordered Williams to pay restitution in the amount of $2,051,642.16 to the health insurance companies and drug manufacturer that paid for medically unnecessary office visits and the OxyContin that he prescribed illegally.

## II. ISSUES ON APPEAL

We discuss at length three of the issues Williams raises on appeal.[4] First, Williams argues that the evidence presented by the Government regarding his prescribing behavior was "framed pursuant to the wrong legal standard," namely the civil standard of care rather than the criminal standard of "acting outside the course of professional practice." Williams contends that, as a result of the admission of

---

[4]Williams also argues that the indictment was insufficient as a matter of law because it did not charge him with dispensing controlled substances "outside the course of professional practice" and because it did not specify the names of the persons to whom he prescribed the controlled substances. The law in this circuit forecloses these arguments. *See United States v. Steele*, 147 F.3d 1316, 1320 (11th Cir. 1998) (en banc); *United States v. Steele*, 178 F.3d 1230, 1234 n.1 (11th Cir. 1999).

Williams argues, for the first time on appeal, that several of his convictions violate the Double Jeopardy Clause. We do not address the merits of this argument because the double jeopardy defense is waived by failure to assert it at trial. *United States v. Bascaro*, 742 F.2d 1335, 1365 (11th Cir. 1984) (citing *Grogan v. United States*, 394 F.2d 287, 289 (5th Cir. 1967)).

Williams also contends that there was insufficient evidence to convict him of many of the dispensing counts (including the count resulting in the death of patient Bonnie Ramos), of conspiracy, and of possession of the firearm. Williams made no motion for judgment of acquittal at trial, so we review his convictions for manifest miscarriage of justice. After a thorough review of the record, we find no such circumstance. There is sufficient evidence to support the jury's determinations of guilt.

Williams further argues that the district court erred in admitting evidence of uncharged bad acts in violation of Federal Rule of Evidence 404(b), amongst them that marijuana and legal non-controlled prescription drugs were found in his home as a part of the search pursuant to warrant, that a patient who was not named in the indictment had overdosed, and that another patient who was not named in the indictment died as a result of an overdose. Williams also argues that admission of this evidence violated Federal Rule of Evidence 403. We find no reversible error in the admission of this evidence; assuming, arguendo, that the district court erred in admitting this evidence, we find that its admission was harmless. And, the properly admitted evidence against Williams provided ample support for every crime of which he was convicted.

Finally, Williams argues that the district court violated his Sixth Amendment right to counsel by denying his third motion to continue the trial, a motion that was brought on the grounds that Williams's counsel was unprepared and had not yet secured an expert witness. We find that, under the facts of this case, denial of the continuance was not an abuse of the district court's discretion.

expert testimony that his behavior failed to meet the standard of care and the prosecutor's references to the standard of care, the jury was confused and this confusion prompted conviction for malpractice rather than criminal behavior.

Second, Williams argues that the district court committed reversible error by refusing to give the jury instruction he proposed on good faith.

Third, Williams appeals his sentences. He argues that his offenses were improperly grouped under the Guidelines and relies on *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), to argue that the sentences violated his Sixth Amendment rights to trial by jury because the district court judge: (1) sentenced him pursuant to the mandatory Guidelines, (2) enhanced the sentences based on the judge's findings that Williams abused a position of public or private trust and obstructed justice, and (3) based the order of restitution on the judge's finding rather than a jury finding of the amount of financial loss suffered by the drug company and insurers.

## III. STANDARDS OF REVIEW

"[W]hen a party raises a claim of evidentiary error for the first time on appeal, we review it for plain error only." *United States v. Baker*, 432 F.3d 1189, 1202 (11th Cir. 2005) (citing *United States v. Jernigan*, 341 F.3d 1273, 1280 (11th Cir. 2003)). Likewise, when a defendant does not object at trial to statements made by the

prosecution, we review under the same plain error standard. *See United States v. Rodgers*, 981 F.2d 497, 499 (11th Cir. 1993).

A district court's rejection of a proposed jury instruction is reviewed for an abuse of that court's discretion. *United States v. Garcia*, 405 F.3d 1260, 1273 (11th Cir. 2005) (citing *United States v. Starrett*, 55 F.3d 1525, 1551 (11th Cir.1995)).

Because Williams properly preserved his *Booker* error argument, we review his claim de novo but will reverse only for harmful error. *See United States v. Paz*, 405 F.3d 946, 948 (11th Cir. 2005). We also review de novo the legality of an order of restitution. *See United States v. Washington*, 434 F.3d 1265, 1267 (11th Cir. 2006).

IV. DISCUSSION

A. Jury Confusion Regarding The Applicable Standard By Which

Williams's Conduct Must Be Judged

Williams argues that the expert witness testimony that his prescribing behaviors failed to meet the civil standard of care, paired with prosecutorial misconduct in referring to that standard, created jury confusion about the burden shouldered by the prosecution. Williams contends that the jury applied the civil standard of care, convicting him of malpractice rather than the crime of dispensing controlled substances outside the course of professional practice.

9

The jury was instructed:

> [A] medical doctor has violated Section 841 when the government has proved beyond a reasonable doubt that he has dispensed or caused to be dispensed controlled substances outside the usual course of professional practice.

(R.15-174 at 126.) Williams concedes (as he did at trial) that this instruction properly states the standard by which his conduct must be judged. (R.16-173 at 269-70.) He maintains, however, that the expert testimony and prosecutorial misconduct pervaded the trial and created an environment in which no jury instruction could cure these errors.

We disagree. As a preliminary matter, we note that Williams did not object at trial to the admission of any of the testimony or to any of the prosecutorial statements that he now alleges were unfairly prejudicial. Because Williams did not object to the admissibility of any of the testimony, the district court made no evidentiary ruling, and we have no ruling to review on appeal. "[W]hen a party raises a claim of evidentiary error for the first time on appeal, we review it for plain error only." *Baker*, 432 F.3d at 1202 (citing *Jernigan*, 341 F.3d at 1280). Under the plain error standard, before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial

10

proceedings. *United States v. Olano*, 507 U.S. 725, 732, 113 S. Ct. 1770, 1776 (1993).

We question whether there is any merit to Williams's argument that the testimony was inadmissible. Evidence that a physician's prescribing behavior repeatedly fails to meet the civil standard of care is arguably relevant circumstantial evidence tending to show that the physician was acting outside the course of professional practice. But that question need not detain us because, even assuming there was error here, it was not plain. Plain error is "clear" or "obvious." *Id.* A court of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law. *Id.* There is no authority, in this circuit or in any other circuit, holding that evidence of noncompliance with the civil standard of care is inadmissible to prove that the action at issue was also outside the course of professional medical practice.[5]

---

[5]Indeed, the Fourth Circuit has recently held otherwise. In *United States v. Alerre*, that court stated:

> [E]vidence that a physician's performance has consistently departed from accepted professional standards supports the proposition that the physician was not practicing medicine, but was instead cloaking drug deals under the guise of a professional medical practice. As a result, such evidence may properly be relevant to establish that the physician contravened the criminal standard of liability.

430 F.3d 681, 691 (4th Cir. 2005). Or, as an expert witness in this case testified, "if the divergence from the standards [of care] was great enough, it would be outside of normal medical practice." (R.13-166 at 92.)

11

Because Williams cannot satisfy the second prong of the plain error test, we proceed no further with the analysis.

Williams's claim of prosecutorial misconduct resulting in jury confusion fails for the same reason. When a defendant does not object to the prosecutor's statements at trial, "relief is available to rectify only plain error that is so obvious that failure to correct it would jeopardize the fairness and integrity of the trial." *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997). Just as there is no rule barring the admission of evidence of failure to meet the civil standard of care in a criminal prosecution of a physician accused of illegally prescribing controlled substances, there is no rule prohibiting prosecutorial reference to the civil standard of care during that trial.

Neither the admission of testimony regarding the civil standard of care nor prosecutorial reference to that standard justifies vacating Williams's convictions or granting him a new trial.

### B. Jury Instruction

At trial, Williams requested the following jury instruction:

> If a doctor dispenses a drug in good faith in medically treating a patient, then the doctor has dispensed the drug for a legitimate medical purpose in the usual course of medical practice; that is, he has dispensed the drug lawfully. Good faith in this context means good intentions and the honest exercise of best professional judgment as to a patient's

12

needs. It means that the doctor acted in accordance with what he reasonably believed to be proper medical practice. If you find that the defendant acted in good faith in dispensing the drugs, then you must find him not guilty.

(R.16-173 at 271.) The district court refused Williams's proposed instruction and instead gave the following instruction to the jury:

A controlled substance is prescribed by a physician in the usual course of a professional practice and, therefore, lawfully, if the substance is prescribed by him in good faith as part of his medical treatment of a patient in accordance with the standard of medical practice generally recognized and accepted in the United States.

(R.15-174 at 126.)

On appeal, Williams argues that the district court abused its discretion in refusing his proposed instruction. We disagree. "The district court has broad discretion in formulating jury instructions as long as those instructions are a correct statement of the law. 'The district court's refusal to incorporate a requested jury instruction will be reversed only if the proffered instruction was substantially correct, the requested instruction was not addressed in charges actually given, and failure to give the instruction seriously impaired the defendant's ability to present an effective defense.'" *Garcia*, 405 F.3d at 1273 (internal citations omitted) (quoting *Starrett*, 55 F.3d at 1551)).

13

In *United States v. Moore*, 423 U.S. 122, 96 S. Ct. 335 (1975), the Supreme Court stated that it was the intent of Congress in enacting the Controlled Substances Act "to confine authorized medical practice within accepted limits," *id.* at 142, 96 S. Ct. at 345, and that "physicians who go beyond approved practice remain subject to serious criminal penalties." *Id.* at 144, 96 S. Ct. at 346. Additionally, the Supreme Court implicitly approved of the instructions given in Moore's trial. In that case, the district court gave an instruction containing the limitation that physicians must prescribe "in accordance with a standard of medical practice generally recognized and accepted in the United States," *id.* at 139, 96 S. Ct. 344, and another that "'honest effort[s]' to prescribe for detoxification in compliance with an accepted standard of medical practice" are not criminal. *Id.* at 143 n.20, 96 S. Ct. 345 n. 20.

Williams's proposed instruction fails to introduce any objective standard by which a physician's prescribing behavior can be judged. Under Williams's proposed instruction, if it is a physician's subjective belief that he is meeting a patient's medical needs by prescribing that patient a controlled substance, then that physician cannot be convicted of violating the Controlled Substances Act even if he acts outside all accepted standards of medical practice. Thus, the proposed instruction is contrary to *Moore*.

14

Additionally, the court's refusal to give Williams's proposed instruction did not seriously impair his ability to present an effective defense. The instruction given by the court afforded Williams an opportunity to defend himself by arguing at trial, as he actually did, that all the prescriptions he wrote were written in good faith, as a part of his legitimate practice of medicine.

Because the district court correctly concluded that Williams's proposed instruction was contrary to law and the instruction given by the court preserved Williams's ability to defend based on good faith, the court did not abuse its discretion in refusing to give the proposed instruction. *See United States v. Norris*, 780 F.2d 1207, 1209 (5th Cir. 1986) (holding that the same jury charge given in Williams's case was a correct statement of the law under *Moore* because it provided both subjective and objective measures of the prescribing behavior).

## C. Sentences

Williams appeals his sentences, arguing that his Sixth Amendment rights to trial by jury were violated because the district court sentenced him pursuant to the then-mandatory Guidelines, enhancing the sentences and ordering restitution based upon the court's own findings of fact.[6] In *United States v. Booker*, 543 U.S. 220, 125 S. Ct.

---

[6]Williams also argues that the district court erred in calculating his Guidelines range because it improperly grouped the offenses for which he was convicted. We have held that, post-*Booker*, a district court still must calculate the Guidelines sentencing range correctly before rendering its ultimate sentence. *United States v. Crawford*, 407 F.3d 1174, 1178 (11th Cir. 2005). We have

15

738 (2005), the Supreme Court found the mandatory Guidelines scheme under which Williams was sentenced unconstitutional.

Though Williams was sentenced before *Booker*, he preserved this issue for appellate review by objecting at the sentencing hearing that the sentences and the order of restitution were unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), and *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004). (R.18-169 at 3-6, 21-22.) The Government concedes that Williams is entitled to de novo review of his sentences, that constitutional error occurred when the district court enhanced Williams's sentences under the mandatory Guidelines based on the court's own findings of fact, and that the Government cannot shoulder its burden of demonstrating that the constitutional error was harmless beyond a reasonable doubt. We agree and therefore vacate the sentences and remand for resentencing.

Notwithstanding the remand for resentencing, however, the district court need not reconsider the order of restitution. We have recently held that restitution orders do not violate the rule announced in *Apprendi* ("[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt") because the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663,

reviewed the district court's grouping of Williams's offenses and find no error. Therefore, on remand, the district court need not revisit the offense grouping.

16

does not have a prescribed statutory maximum. *Dohrmann v. United States*, ___ F. 3d ___, No. 05-15360 (11th Cir. March 15, 2006) (citing *Apprendi*, 530 U.S. at 490, 120 S. Ct. at 2362-63).

We now extend the reasoning of our precedent and hold that *Booker* does not apply to restitution orders. We do so because restitution orders are authorized by the MVRA, a statute unaffected by *Booker*. *See United States v. Sosebee*, 419 F.3d 451, 462 (6th Cir. 2005) ("Although the guidelines mandate imposition of restitution where allowable under the statutes, the restitution statutes function independently from the guidelines and do not rely on the guidelines for their validity. Thus, the *Booker* Court's holding that the Sentencing Guidelines are now merely advisory does not affect orders of restitution."). Additionally, the MVRA does not set an upper limit on the amount of restitution. *See Dohrmann*, No. 05-15360 (11th Cir. March 15, 2006). Therefore, a restitution order cannot be said to exceed the maximum provided by the penalty statutes, and it cannot violate the rule announced in *Booker* ("any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.").

17

*Booker*, 543 U.S. at 244, 125 S. Ct. at 756.[7]  Thus, we find no error in the imposition of this restitution order.

## V.  CONCLUSION

For the foregoing reasons, we affirm Williams's convictions but vacate his sentences and remand to the district court for resentencing.

CONVICTIONS AFFIRMED; SENTENCES VACATED; REMANDED FOR RESENTENCING.

---

[7]In holding that *Booker* does not apply to restitution orders, we join the Third, Fifth, Sixth, Seventh, Eighth, Ninth and Tenth Circuits.  *See United States v. Leahy*, 438 F.3d 328, 338 n.12 (3d Cir. 2006) (citing *United States v. Garza*, 429 F.3d 165, 170 (5th Cir.2005) ("We agree with our sister Circuits, who have uniformly held that judicial fact-finding supporting restitution orders does not violate the Sixth Amendment."); *Sosebee*, 419 F.3d at 461 ("Given existing Sixth Circuit precedent and recent decisions of the other circuits on this issue, we now conclude that *Booker* does not apply to restitution and, thus, that Sosebee's Sixth Amendment challenge has no merit."); *United States v. George*, 403 F.3d 470, 473 (7th Cir.2005) ("We have accordingly held that *Apprendi v. New Jersey* . . . does not affect restitution . . . and that conclusion is equally true for *Booker*." ); *United States v. May*, 413 F.3d 841, 849 (8th Cir. 2005) ( "[S]everal circuits have affirmatively rejected the notion that *Apprendi*, *Blakely*, or *Booker* affect the manner in which findings of restitution can be made. . . . These cases are persuasive."); *United States v. Bussell*, 414 F.3d 1048, 1060 (9th Cir. 2005) ("In contrast to its application of the Sentencing Guidelines, the district court's orders of restitution and costs are unaffected by the changes worked by *Booker*." ); *United States v. Visinaiz*, 428 F.3d 1300, 1316 (10th Cir. 2005) (noting that "*Blakely* and *Booker* do not apply to restitution" because "[i]n the Tenth Circuit, restitution is not criminal punishment")).