[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 1, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-10674
Non-Argument Calendar

_____

D. C. Docket No. 04-00047-CR-3-001-LAC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LUCIANO MURGA,
a.k.a. Leo,
MATTHEW T. PUCKETT,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Florida

_____

**(August 1, 2006)**

Before MARCUS, WILSON and PRYOR, Circuit Judges.

PER CURIAM:

Luciano "Leo" Murga and Matthew T. Puckett appeal their convictions for participating in a drug trafficking conspiracy. We affirm.

## I. BACKGROUND

The participants in the drug trafficking conspiracy, besides Murga and Puckett, were Doug Ruble, Charlotte Travillo, Larry Williams, Johnny Rizo, and Greg Lake. Travillo is the sister of Williams and the girlfriend of Ruble. The conspiracy centered around Ruble, who lived in Florida and bought marijuana and cocaine from Murga and Rizo, who lived in Texas. Williams, Lake, and Travillo helped Ruble to transport the drugs from Texas to Florida for resale. Puckett helped Ruble to deliver the drugs and eventually became an equity partner with Ruble.

The government charged Murga and Puckett with conspiracy to distribute and to possess with the intent to distribute 5 kilograms or more of cocaine and 1000 kilograms or more of marijuana. 21 U.S.C. §§ 841(a), 841(b)(1)(A)(ii) & (vii). At trial, the government presented extensive evidence about the participation of Murga and Puckett in the conspiracy. The evidence against Murga included the testimony of Lake, Williams, Travillo, and Rizo. The evidence against Puckett included the testimony of Williams, Travillo, and Rizo. Ruble was not available to testify at trial because he was dead.

2

Lake testified that, on his first trip to Texas to pick up and to transport marijuana for Ruble, sometime in April 1999, he visited Leo's Auto Sales, which Murga owned. A passenger in Lake's car entered Leo's Auto Sales while Lake remained in the car. Upon returning to the car, that passenger told Lake that "we're on for tomorrow" and "that's the guy who gets it [for us]." The next day, Lake retrieved between 300 and 350 pounds of marijuana, which was loaded in the trunk of a car.

On one trip, Ruble accompanied Lake in Texas and the men stayed overnight in adjacent rooms at a hotel. Ruble had about $220,000 in a briefcase in his room. The next morning, Lake saw a man knock on Ruble's door and enter Ruble's room. That man wore a blue work shirt with a name tag that said "Leo." One half hour later, Ruble informed Lake that a car was loaded with 350 pounds of drugs and ready to go. At trial, Lake identified the man in the blue shirt as Murga. Lake estimated that he transported over 1200 pounds of marijuana from Texas to Florida in just his first four trips.

Williams testified that, when he and Ruble would buy marijuana in Texas, they would "go through" Murga or Rizo, who connected Williams and Ruble "to the man that brought it from Mexico." Williams dealt with Murga six or seven times, and he and Ruble purchased loads that typically weighed about 100 pounds.

3

After Williams quit his partnership with Ruble in 1998 and began to work only as a driver, Williams did not know whether Ruble "dealt with [] people" other than Murga and Rizo, but the marijuana Williams transported "would either come through [Rizo or Murga]." As a driver, Williams transported three loads, which ranged from 100 to 400 pounds. Williams later resumed his partnership with Ruble and again bought marijuana from Murga, including 78 pounds in a transaction sometime after January 2001. Williams also testified that Travillo and Ruble bought 254 pounds of marijuana in Houston in 1998.

Rizo testified that Murga asked Rizo whether he could obtain 100 pounds of marijuana for a customer. That customer was Ruble. Rizo obtained the marijuana and, with Murga, split the profit from the sale. After that deal, Rizo began to work in the body shop at Leo's Auto Service. Rizo testified that, over time, he and Murga split profits on the sale of between 400 to 600 pounds of marijuana to Ruble.

Travillo testified that Murga was one of the sources from whom she, Ruble, and Williams bought marijuana in Texas. Travillo testified that "[t]here was [sic] quite a few times that [Ruble] and I would go by [Murga's] shop" and they stayed at Murga's house "on a couple of occasions." Travillo "was there a couple of times at [Murga's house] when they would bring drugs in the garage, and [Ruble]

4

would purchase the drugs."

Williams, Rizo, and Travillo also testified against Puckett. They each testified about at least one statement that Ruble had made about Puckett's participation in the conspiracy. At least six of these statements were admitted into evidence.

Williams testified that Ruble told Williams about a deal in which Puckett delivered marijuana to Ruble's customers for $25 per pound. Puckett objected to that testimony as inadmissible hearsay. The government responded, "I think what I've established through the testimony of this witness is a conspiracy, and these statements are made by a co-conspirator in furtherance of the conspiracy advising him of the nature and the scope of the dealing." The government continued, "I would offer him as an exception to the hearsay rule as a co-conspirator statement in furtherance of the conspiracy advising him of what they are going to do and who is doing what. And as a result they are not hearsay under the Federal Rules of Evidence." The district court overruled the objection.

Travillo likewise testified that Ruble had told her that Ruble and Puckett shipped cocaine to Florida by UPS, doubled their money on cocaine they sold, and shipped cocaine on a train, which was intercepted in Louisiana. Puckett did not object to any of that testimony by Travillo. Travillo also identified an address

5

book as Ruble's based on his handwriting and testified that several telephone numbers in the address book belonged to Puckett and his wife. The address book also contained phone numbers for Murga and Rizo. Puckett did not object to Travillo's testimony about the address book and telephone numbers.

Rizo testified that he met Puckett through Ruble. Rizo testified that Ruble had told Rizo that Ruble and Puckett "used to work together." Puckett did not object to that testimony.

Murga offered a defense that centered around his status as a confidential informant for the Federal Bureau of Investigation, and he called four FBI agents to testify for him. One of those agents, Johnny Cooper, testified that the FBI gave Murga "specialized criminal authorization to broker deals or basically so he could talk to drug dealers and set up meetings . . . , you know, get himself in a position where he could deal with members of the organizations." There were limits to Murga's immunity. Murga was not authorized "to be a drug dealer, that is to put drugs in the hands of people that were coming from Florida on a repeated basis over and over and over and be compensated by the pound or the kilo for what he was supplying." Murga also was not permitted to handle drugs.

At one point, the district court interrupted the testimony of Mark Kirby, one of the agents who testified for Murga. When Kirby acknowledged that Murga was

permitted to broker drug deals to gain trust in the drug community, Murga's attorney asked Kirby, "And the end result was little fish might get away but the big fish get caught?" Kirby replied, "That's exactly right. The reason that Mr. Murga has been so successful for the FBI . . . is because his position afforded him the opportunity to have a reason to know information, the reason hopefully no one in this room . . . ." The district court interjected, "Sir, I don't believe that was the question." Kirby replied, "Okay, sir." Murga's attorney then restated the question and Kirby answered it.

At another point, the district court stated to Richard Dye, another agent who testified for Murga, "Sir, you'll note that the microphone isn't working. That's because you've messed it up. So if you'll leave it alone, it will work fine." Dye did not respond to the district court.

The jury convicted Murga of conspiracy to distribute or to possess with the intent to distribute 1000 kilograms or more of marijuana but not of conspiracy to distribute or to possess with the intent to distribute cocaine. The jury convicted Puckett of conspiracy to distribute or possess with the intent to distribute 5 kilograms or more of cocaine and 1000 kilograms or more of marijuana.

Before sentencing, Murga filed three motions. One motion requested the trial judge to recuse himself from sentencing. Murga argued in that motion that the

impartiality of the trial judge might be questioned on three grounds:  the trial judge "obvious[ly]" was "irritated" with Agent Kirby, as evidenced by the "tone of voice used by the trial judge" when he interrupted Kirby's testimony; the trial judge was "obviously irritated" when he informed Agent Dye that the microphone would work fine if he would leave it alone; and, after the FBI agents had testified for Murga, the trial judge allegedly "called the FBI Agents 'superiors [sic] and complained about their testimony."  A second motion, in seeking a new trial, relied upon those same grounds as evidence of "an improper bias by the court in favor of the government [that] render[ed] the jury's verdict tainted."  A third motion sought to "propound . . . interrogatories to the trial judge" about whether, "[f]ollowing conclusion of the trial day on Wednesday, November 3, 2004, in this matter, [the trial judge] contact[ed] a superior of the FBI Agents who had testified on November 3[], 2004?"

At a sentencing hearing for Murga, the trial judge denied those motions. The trial judged explained that he thought it was "inappropriate" "to propound interrogatories to the trial judge," but stated that the "answer to [the interrogatory] is no."  The trial judge also stated, "I take no issue with agents, because they are subject to subpoena just like anybody else.  They raise their hand and take an oath to tell the truth, and I have no objection, when they are asked a question, if they do

8

that. Whatever the answer is, I don't care." The trial judge continued, "But their presentation before the court, as I say, was about as poor as any that I have ever seen." The district court sentenced Murga and Puckett to terms of imprisonment.

## II. STANDARD OF REVIEW

We review a decision of a judge not to recuse himself for abuse of discretion and will affirm that decision "unless we conclude that the impropriety is clear and one which would be recognized by all objective, reasonable persons." United States v. Bailey, 175 F.3d 966, 968 (11th Cir. 1999).

We review a denial of a motion for a new trial for abuse of discretion, United States v. Russo, 717 F.2d 545, 550 (11th Cir. 1983), and we will not reverse a conviction based on the comments of a trial judge unless the comments were "so prejudicial as to amount to a denial of a fair trial," United States v. Morales, 868 F.2d 1562, 1576 (11th Cir. 1989) (internal quotations omitted).

We review de novo the denial of a motion for a judgment of acquittal notwithstanding the verdict. United States v. Garcia, 447 F.3d 1327, 1334 (11th Cir. 2006). "In considering a motion for the entry of a judgment of acquittal, a district court 'must view the evidence in the light most favorable to the government, and determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt.'" United States v. Miranda, 425 F.3d

9

953, 959 (11th Cir. 2005) (quoting United States v. Sellers, 871 F.2d 1019, 1021 (11th Cir. 1989)).

"We review the evidentiary rulings of the district court for a clear abuse of discretion." United States v. Tinoco, 304 F.3d 1088, 1119 (11th Cir. 2002). When a party failed to object to the admission of evidence that the party challenges on appeal, we review that challenge for plain error. United States v. Chilcote, 724 F.2d 1498, 1503 (11th Cir. 1984).

## III. DISCUSSION

This appeal presents four issues. First, Murga argues that the trial judge abused his discretion by not recusing himself from deciding Murga's motion for a new trial. Second, Murga argues that the district court abused its discretion by denying Murga's motion for a new trial. Third, Murga argues that the district court erroneously denied his motion for a judgment of acquittal. Fourth, Puckett argues that the district court abused its discretion by admitting six out-of-court statements without "expressly and on the record" making the predicate findings required by Federal Rule of Evidence 801(d)(2)(E) to admit the statements of a co-conspirator made in the course and furtherance of the conspiracy. We address each argument in turn.

10

*A. The Trial Judge Did Not Abuse His Discretion by Not Recusing Himself.*

Murga argues that the trial judge abused his discretion by not recusing himself because the judge displayed bias against the FBI agents who testified for Murga. A federal judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned," 28 U.S.C. § 455(a), or "[w]here he has a personal bias or prejudice concerning a party," id. at § 455(b)(1). "Bias sufficient to disqualify a judge under section 455(a) and section 455(b)(1) must stem from extrajudicial sources, unless the judge's acts demonstrate such pervasive bias and prejudice that it unfairly prejudices one of the parties." Bailey, 175 F.3d at 968 (internal quotations omitted). Murga provides no reason to conclude either that whatever bias the trial judge might have demonstrated in commenting during the testimony of Kirby and Dye "stem[med] from extrajudicial sources" or that those comments "unfairly prejudice[d]" him. This argument fails.

*B. The District Court Did Not Abuse Its Discretion by Denying Murga's Motion for a New Trial.*

Murga argues that the district court abused its discretion by denying Murga's motion for a new trial because the trial judge displayed bias against the FBI agents who testified for Murga and therefore "deprived [Murga] of a fair trial." A conviction might be reversed if the trial judge made comments that "are so prejudicial as to amount to a denial of a fair trial" and had a "clear effect on the

11

jury." Morales, 868 F.2d at 1576 (internal quotations omitted). The comments of the trial judge during the testimony of Kirby and Dye were not so prejudicial as to amount to a denial of a fair trial. This argument fails.

*C. Sufficient Evidence Supported Murga's Conviction.*

Murga argues that the district court erroneously denied his motion for a judgment of acquittal because the evidence was insufficient to establish his liability for 1000 kilograms or more of marijuana. Murga argues that, because his immunity shielded him from liability for drug transactions that he brokered but did not profit from, "his culpability according to the testimony put forth at trial[] should be limited to the 273 kilograms of marijuana from which Murga received a profit during the time frame he and Rizo were involved in the conspiracy."

Sufficient evidence supported Murga's conviction. Lake, Williams, Travillo, and Rizo testified extensively about the conspiracy in which Murga participated for profit. Lake estimated that he transported over 1200 pounds of marijuana in his first four trips to Texas, and he made a total of eight trips. Lake visited Murga's body shop to arrange for a load of marijuana and saw Murga visit Ruble at a hotel where Lake retrieved a load of marijuana. Williams testified that, when he was a partner of Ruble, he transported or bought six or seven loads of marijuana that typically weighed 100 pounds, and, as a driver, Williams

12

transported three loads, which ranged from 100 to 400 pounds. Williams and Ruble received marijuana from Murga when Williams and Ruble were partners. From 1998 to 2000 or 2001, when Williams was a driver, Williams continued to obtain marijuana from Murga on behalf of Ruble. Travillo testified that Murga was a source of marijuana for her and Ruble and they had stayed overnight at Murga's house. Rizo testified that he and Murga supplied Ruble with marijuana. A reasonable jury could find beyond a reasonable doubt that Murga participated, beyond the scope of his immunity to broker deals, in a conspiracy to traffic 1000 kilograms or more of marijuana.

### D. Puckett's Argument About the Admission of Six Out-of-Court Statements Fails.

Puckett argues that the district court abused its discretion by admitting six out-of-court statements without "expressly and on the record" making the predicate findings required by Federal Rule of Evidence 801(d)(2)(E) to admit the statements of a co-conspirator made in the course and furtherance of the conspiracy. This argument fails.

We first address the standard under which we review Puckettt's challenges. Although Puckett objected to only one of the statements he now challenges, he argues that he preserved the challenges for appeal because any objection beyond his initial objection would have been "futile." We disagree. Although a party

13

might not need to object each time a witness offers disputed testimony once a district court has admitted that testimony over objection, see, e.g., United States v. Alvarez, 584 F.2d 694, 697 (5th Cir. 1978), Puckett now challenges the testimony of three witnesses. Because each out-of-court statement admitted under Rule 801(d)(2)(E) must be made in the course and furtherance of a conspiracy, it would not have been futile for Puckett to object each time that a witness testified about a different out-of-court statement. We review the admission of the statement to which Puckett objected for abuse of discretion and the admission of the other five statements for plain error.

Williams testified that Ruble told Williams that Puckett would deliver marijuana for $25 per pound. Puckett objected to that testimony. The government responded that William's testimony had established that there was a conspiracy, Ruble was a co-conspirator, and Ruble's statements were made in furtherance of the conspiracy. The district court then admitted the testimony. Because the district court admitted Williams's testimony directly after the government specifically addressed the three predicate factual findings required by Rule 801(2)(d)(E), we conclude that the district court implicitly made the findings required by that rule. See United States v. Miles, 290 F.3d 1341, 1352 (11th Cir. 2002) ("While the trial court did not make explicit findings, the court admitted the testimony pursuant to

14

[Rule] 801(d)(2)(E) and implicitly found that [the disputed] statement was made in the course of, and in furtherance of, a conspiracy."). This challenge fails.

We review the remaining challenges for plain error. "Under the plain error standard, before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights." United States v. Williams, 445 F.3d 1302, 1308 (11th Cir. 2006). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id.

We decline to decide whether it was plain error for the district court not to make "expressly and on the record" the findings required by Rule 801(d)(2)(E) because we conclude that the admission of the testimony Puckett challenges did not affect his substantial rights. Id. A preponderance of the evidence established that a conspiracy existed and Ruble was Puckett's co-conspirator. See Fed. R. Evid. 801(d)(2)(E). Statements admitted under Rule 801(d)(2)(E) also must be made in the course and furtherance of a conspiracy, see id., but we apply "a liberal standard in determining whether a statement is made in furtherance of a conspiracy," United States v. Byrom, 910 F.2d 725, 735 (11th Cir. 1990), and conclude that the challenged out-of-court statements were made in the course and

15

furtherance of a conspiracy. Ruble's statements to Travillo were about drug profits and shipments of cocaine, Ruble's address book contained the telephone numbers of several co-conspirators, and Ruble's statement to Rizo was about Ruble's past relationship with Puckett, a co-conspirator whom Ruble introduced to Rizo, another co-conspirator. These challenges fail.

## IV. CONCLUSION

The convictions of Murga and Puckett are

**AFFIRMED.**