[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-15426

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 20, 2007
THOMAS K. KAHN
CLERK

D. C. Docket No. 05-60022-CR-WPD

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HENRY DONJOIE,
a.k.a. Joseph Pierre,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(April 20, 2007)**

Before BLACK, MARCUS and KRAVITCH, Circuit Judges.

PER CURIAM:

Henry Donjoie appeals his convictions in connection with a conspiracy to

rob a narcotics stash house. For the reasons that follow, we affirm.

## I. Background

The facts of this case as set forth in the companion case <u>United States v.</u> <u>Orisnord</u>, --- F.3d ----, 2007 WL 1062529, at *1-*3 (11th Cir. Apr. 11, 2007), are as follows.

In December of 2004, a confidential informant ("CI") informed federal agents from the Bureau of Alcohol, Tobacco, and Firearms ("ATF") that [Fednert] Orisnord and others were interested in committing home invasion robberies of narcotics stash houses. Based on this tip, ATF Special Agent Michael Connors ("Connors"), acting undercover, met with Orisnord and the CI in Sunrise, Florida on December 29, 2004. Connors also told Orisnord that he performed security for a Colombian drug organization, that his employers owned a cocaine stash house in Fort Lauderdale, and that he was looking for people to help him rob the stash house. Conners told Orisnord that the stash house usually contained 20 to 25 kilograms of cocaine and that his Colombian bosses often moved the "stash" to different locations. Indicating that he had performed several robberies in the past, Orisnord agreed to assemble a team to rob the stash house. He also

agreed to give Connors four kilograms of cocaine as his share of the robbery proceeds.

On January 6, 2005, Connors and the CI met with Orisnord and Sonny Hilaire, who Orisnord introduced as one of his "boys" who would be performing the "lick" with him. During a telephone conversation a few days later, Orisnord told Connors that there was a problem with Hilaire's participation, but that he was still interested in performing the robbery. On January 18, 2005, Connors called Orisnord and told him that a shipment of cocaine was arriving the next day. After Orisnord indicated that his team was ready, Orisnord and Connors scheduled the robbery for the night of January 19, 2005. The plan called for the CI to pick up Orisnord's robbery team in a vehicle ostensibly belonging to Connors' girlfriend. They would then meet with Connors at an unspecified location to review the final details and wait for Connors' Colombian employers to call and give him the stash-house address. The team would then drive to the stash house in a rental car provided by Connors.

On January 19th, driving a BMW supplied by Connors and equipped with video and audio recorders as well as a global-

3

positioning-system transmitter, the CI picked up Orisnord and [Theodore] Witherspoon in Fort Lauderdale. They then drove to Pompano Beach to pick up [Joniel] Polynice. . . . After returning to Fort Lauderdale, the CI, Orisnord, Polynice, and Witherspoon met Connors at a Hess gas station. Connors reiterated that the robbery was to occur that night, that the team was to follow him to an undisclosed location to await the call from the Colombians, and that they should have their firearms ready. . . . Orisnord [said] that they would need three guns and [that] he needed five minutes to get his. Polynice stated that they had to get "the fire" and "the tools." . . .

After the meeting with Connors, the CI, Orisnord, Witherspoon, and Polynice drove to Pompano. Upon arriving at a housing project, Orisnord entered an apartment occupied by approximately ten people and asked if anyone had seen "Sonny." Approximately 20 minutes later, the CI entered the same apartment and asked if anyone had seen "Face" (which was one of Orisnord's aliases). Addressing everyone in the apartment, including brothers Henry and Bernard Donjoie, the CI stated that a "big deal" with "a lot of money" was going down, that he was driving a BMW belonging to his boss's wife, and that anyone

4

interested in the "deal" should accompany him to meet his boss to learn the details. Henry and Bernard accepted the invitation and joined the other team members to learn more about this "deal." Sometime later, the CI, Orisnord, Witherspoon, Polynice, and the Donjoies got into the BMW and traveled back to Fort Lauderdale to meet with the CI's boss (Connors) and discuss the "deal." Although no one mentioned firearms during the drive, Orisnord phoned Connors and said that they were now "all set."

Upon arriving in Fort Lauderdale, the team stopped at a Citgo gas station. Orisnord exited the BMW and conversed with the occupants of a Buick parked at the station. Orisnord then returned to the BMW, and both vehicles traveled to a Hess station where Connors awaited. When the vehicles entered the Hess parking lot, Connors pulled his car in front of the BMW and the Buick, and both vehicles followed Connors to a warehouse. Connors' vehicle and the BMW parked in the warehouse parking lot, while the Buick parked across the street. The CI and the other occupants of the BMW entered the warehouse with Connors.

Because the Donjoie brothers were the last to meet Connors,

Orisnord instructed Connors to "[t]ell those two what's going on. Explain to them the deal." Connors explained that he worked security for Colombians who had a stash house containing 20 to 25 "keys," that there were two or three armed guards in the stash house, that the Colombians moved the stash around such that he did not yet know the address, and that once the Colombians phoned him to provide the address, the team would drive to the house and perform the robbery. Connors further explained that to conceal his involvement in the robbery, one of the crew members should strike him on the head. Henry asked Connors several questions about the plan, such as how many armed guards would be in the house; where "it" would be located; whether there were "more people to pick up more packages;" and where they would need to leave Connors' share. Once Connors answered those questions, Henry said that the "garage is the only way to go," and that the "shit is already in the house." At some point, Orisnord asked Connors how many "keys" he wanted, Connors responded that he wanted four, and Henry replied: "Four. That's fine. That's yours. That's guaranteed." Bernard also responded that Connors was "guaranteed that." After Connors instructed the team to

6

place his four keys under the BMW, Henry said they would "put it in a trash bag" under the car. Bernard said that they would be "In and out and that's it." Connors then asked if the team "had enough fire to take care of it," and one of the team members responded "[d]on't you worry about that" because the "fire is in the car."

Based on these discussions, Agent Connors determined that the team members were capable of, and committed to, carrying out the robbery, and that none of them had evinced a clear desire to withdraw. He gave the arrest signal, and a SWAT team moved in. Approximately ten minutes after the arrests, Agent Leonard Coy entered the warehouse and searched the defendants, finding a loaded pistol, black gloves and a knit hat on Henry; a loaded pistol, and black gloves on Polynice; and a loaded pistol and black gloves on Bernard. Officers also discovered two black stocking caps in the front passenger seat of the BMW where Orisnord had been sitting. . . .

A grand jury returned an indictment against the defendants, charging them with conspiracy to commit a Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count 1); conspiracy (Count 2) and attempt (Count 3) to possess with intent to distribute cocaine, both in

7

violation of 21 U.S.C. § 846; using, carrying, and possessing a firearm during and in relation to a crime of violence (referring to Count 1) and a drug trafficking crime (referring to Counts 2 and 3), in violation of 18 U.S.C. § 924(c)(1)(A) (Count 4); and possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g) (Count 5).

Id.

Henry's case was severed from that of his codefendants who were tried separately.[1]  Following his separate trial, Henry was convicted on all counts charged in the indictment.  He was sentenced to 322 months imprisonment.

## II. Discussion

On appeal, Henry argues that the evidence was insufficient to sustain his convictions.  He also argues that the Government violated his due process rights by engaging in outrageous conduct.

Based on careful review of the record and the parties' arguments, we conclude that the evidence was sufficient to sustain Henry's convictions, and we affirm those convictions without further discussion.  We likewise conclude that

---

[1] In their separate trial, Bernard, Orisnord, Witherspoon, and Polynice were convicted of all counts charged in the indictment.

Henry's due process challenge is without merit, and we do not discuss it further.[2]

### III.  Conclusion

For the foregoing reasons, we **AFFIRM**.

---

[2] Although Henry properly preserved his sufficiency-of-the evidence challenge, he failed to preserve his due process challenge.  Thus, the standard of review for this unpreserved issue is plain error.  United States v. Williams, 445 F.3d 1302, 1307 (11th Cir. 2006).  Based on a thorough review of the record, Henry has failed to meet the plain error standard.